IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 24, 2008

Charles R. Fulbruge III
Clerk

No. 06-10519

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

IGNATIUS CHUKA OGBA; IFEANYI BONIFACE OBGA, also known as
IFFY OGBA; PATRICK DAVID ANTOON

Defendants-Appellants

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:04-CR-37-1

Before HIGGINBOTHAM, DAVIS, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Ignatius Chuka Ogba ("Chuck") started a durable medical equipment ("DME") supply corporation for Medicare patients, and his brother, Ifeanyi Ogba ("Iffy") helped him run the business. They hired recruiters to find potential recipients of wheelchairs and paid doctors, including Dr. Patrick Antoon, to refer wheelchair recipients to their corporation. Antoon also charged Medicare for his visits with potential wheelchair recipients. Chuck and Iffy represented to Medicare that they had provided patients with high-end electric wheelchairs, but at times they provided no equipment at all, provided lower-end equipment, or took back the wheelchairs after delivering them to Medicare recipients. A jury

found Defendants guilty on all counts, which included health care fraud, paying and receiving illegal kickbacks, engaging in monetary transactions with illegally-obtained property, alteration or falsification of records, endeavoring to influence a grand jury, and conspiracy to commit health care fraud, paying and receiving illegal remuneration, and illegal monetary transaction.[1] Defendants all appealed.

I

The jury could have concluded the following beyond a reasonable doubt. Chuck and Iffy Ogba, with the help of doctors and recruiters, carried out a scheme to profit from the regulations of Medicare. Medicare's "Part B" regulations allow Medicare to reimburse suppliers of certain types of DME, such as wheelchairs, for the equipment that they provide to Medicare patients. Chuck set up a corporation called Universal Health Services, Inc. ("Universal"), an approved Medicare supplier located in Dallas, Texas. The brothers later set up a second business, Apex Medical Services ("Apex"), to provide wheelchairs to Medicare beneficiaries in Magnolia, Arkansas and the surrounding area. Apex was not an approved independent supplier of DME so it submitted its claims for

---

[1] Not all counts included all of the Defendants. Count One, Conspiracy to Commit Health Care Fraud, Paying and Receiving Illegal Remuneration (Health Care Kickback) and Illegal Monetary Transaction (Violation of 18 U.S.C. § 371 (18 U.S.C. § 1347 and 42 U.S.C. §§ 1320a-7b(b)(2)(A) and 1320a-7b(b)(1)(A) and 18 U.S.C. § 1957(a)), charged all Defendants. Counts Two through Twelve, Health Care Fraud (Violations of 18 U.S.C. §§ 1347 and 2), charged all Defendants. Count Thirteen, Paying Illegal Remuneration (Violation of 42 U.S.C. §1320a-7b(b)(2)(A)), charged Chuck. Count Fourteen, Paying Illegal Remuneration (Violation of 42 U.S.C. §1320a-7b(b)(2)(A)), charged Iffy. Count Fifteen, Paying Illegal Remuneration and Aiding and Abetting (Violations of 42 U.S.C. §1320a-7b(b)(2)(A) and 18 U.S.C. § 2), charged Chuck. Count Sixteen, Receiving Illegal Remuneration (Violation of 42 U.S.C. § 1320a-7b(b)(1)(A)), charged Antoon. Counts Seventeen and Eighteen, Engaging in Monetary Transaction in Property Derived From Specified Unlawful Activity (Violations of 18 U.S.C. § 1957(a) and 2), charged Chuck. Counts Nineteen through Twenty-One (Violation of 18 U.S.C. § 1957(a) and 2) charged Iffy. Count Twenty-Two, Obstruction of Criminal Investigation of Health Care Offense (Violation of 18 U.S.C. § 1518), charged Antoon. Count Twenty-Three, Alteration or Falsification of Records in Federal Investigation (Violation of 18 U.S.C. § 1519) charged Antoon. Count Twenty-Four, Endeavor to Influence a Grand Jury (Violation of 18 U.S.C. § 1503), charged Antoon.

Medicare reimbursement through UHS. Iffy worked for both of Chuck's companies.

The brothers hired Rhonda Lambert Smith and other recruiters to help them sell wheelchairs. Smith sought out individuals who might need wheelchairs, referring them to Dr. David Antoon in Magnolia and Dr. Lloyd McGriff in Dallas, and other doctors. These referrals were made in order to obtain certification that the patients needed expensive electric wheelchairs called "K0011 power wheelchairs" ("K-11s"). The doctors in turn sent wheelchair prescriptions to UHS/Apex. The brothers paid the doctors an average of $200 for every referred patient for whom Medicare approved a wheelchair.[2]

Medicare required two forms from suppliers of chairs, a CMS[3] 1500 and a Certificate of Medical Necessity ("CMN"). The CMS 1500 form requires identification of the patient who will be receiving the equipment, the reason for the patient's receipt of the equipment, supplier identification, and identification of the referring doctor. Doctors and suppliers prepare the CMN. This form has four parts. Part A, filled out by the equipment supplier, contains identifying information such as the patient's name and address, the supplier's identification number, and the treating physician authorizing the equipment. Part B, completed by the physician, describes the length of time during which the patient will need the equipment, diagnosis codes describing why the patient needs the equipment, the physical constraints of the patient demonstrating wheelchair necessity, such as weak upper extremities and the inability to

---

[2] At trial, the parties disputed whether doctors received payments for all referrals or only for referrals of patients whose claims were not denied by Medicare.

[3] This form used to be called an HCFA 1500 (for the Healthcare Financing Administration) and is still commonly referred to by its former name. The HCFA is now called the Centers for Medicare and Medicaid Services ("CMS").

operate manual wheelchairs,[4] and the hours per day that the patient will spend in the chair. Part C, completed by the supplier, describes the type of equipment prescribed and its costs. Doctors signing the CMN verify in its Section D that they have reviewed Parts A through C and the charges for the equipment ordered for the patient, that all information is true, and that they will be subject to criminal and civil liability for any falsification.[5]

Under the Ogba brothers' plan, lasting from approximately 2002 through 2004, the brothers recruited patients and sent these patients to "company" physicians who regularly sent wheelchair prescriptions to UHS/Apex. The physicians signed off on Part D of the form before Part C was filled out, thus "approving" equipment and charges for equipment not yet provided, and sent the forms to UHS/Apex. UHS then sent equipment reimbursement requests to Palmetto GBA, the Texas administrator of Medicare Part B that provided reimbursement for wheelchair suppliers. The brothers received more than $4.8 million in Medicare reimbursement.

In addition to paying for wheelchair prescriptions,[6] the Ogba brothers, through UHS, entered false delivery dates on the form – typically the date of the

---

[4] The physical requirements are that the patient requires a wheelchair to move around, has "quadriplegia" or similar serious maladies, has "severe weakness of the upper extremities" due to a neurologic or other disease, and is "unable to operate any type of manual wheelchair."

[5] Specifically, the provision states, "I certify that I am the treating physician identified in Section A of this form. I have received Sections A, B and C of the Certificate of Medical Necessity (including charges for items ordered). Any statement on my letterhead attached hereto, has been reviewed and signed by me. I certify that the medical necessity information in Section B is true, accurate and complete, to the best of my knowledge, and I understand that any falsification, omission, or concealment of material fact in that section may subject me to civil or criminal liability."

[6] 42 U.S.C. § 1320a-7b(b)(2) provides criminal penalties for "whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . ."

wheelchair recipient's visit to the doctor for a wheelchair prescription – and requested reimbursement for wheelchairs before they were supplied. The brothers added accessories to doctors' prescriptions, and requested reimbursement for 100% of the cost of the wheelchairs, violating a requirement that patients pay 20% in coinsurance. Finally, although nearly all of UHS's reimbursement claims were for K-11 wheelchairs, the brothers often gave patients less expensive equipment, such as scooters, or failed to deliver any equipment. In some cases, they delivered equipment and then took it back, claiming that it needed to be repaired. The brothers deposited their illegally-derived profits in several domestic and foreign bank accounts.

Antoon, in signing the CMNs, falsely certified that he was patients' treating doctor. By its section D, he certified that the equipment purchased, as indicated in Section C, matched the equipment prescribed, whereas Section C had not yet been completed. He charged Medicare for his visits with wheelchair patients, and he received illegal payments from the Ogba brothers.[7] He also certified that patients needed K-11s when they did not need them.

Antoon recorded his meetings with the wheelchair patients as appointments in his computer system, only after he was subpoenaed by the Grand Jury. He then told an employee to record the appointments in the computer, back-date them, and prepare questionnaires and letters to fill in wheelchair patients' files. Antoon explained that he had ordered the filling in of appointments in response to a request by the prosecutor that the entries be reduced to an electronic format.

---

[7] 42 U.S.C. § 1320a-7b(b)(1) provides criminal penalties for "(whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . ."

Recruiter Smith testified that she paid Antoon for each CMN that he signed, but in other testimony stated that she did not reimburse Antoon for the patients whose wheelchair claims were rejected by Medicare. The Government's evidence included a tape recording of one of these payment sessions. At trial, Smith described the recording, indicating that she and Antoon were counting the money for each patient whose prescription was fulfilled and deducting any denied claims. Antoon testified that the payments were for time blocked out for his office visits with potential wheelchair recipients, not for signing CMNs. He also testified that Smith paid him for every CMN he signed, not just for CMNs that resulted in Medicare approvals, urging that this shows that he did not intend to receive illegal kickbacks.

Recruiter Smith and Dr. McGriff entered into plea agreements and testified for the Government. Dr. McGriff also signed a plea agreement and testified. A jury convicted the Defendants[8] for healthcare fraud; paying and receiving illegal remuneration and aiding and abetting; engaging in monetary transactions with property derived from unlawful activity; obstruction of a criminal investigation; alteration/falsification of documents; endeavor to influence a Grand Jury; and conspiracy to commit health care fraud, paying and receiving illegal remuneration ("health care kickback"), and illegal monetary transaction. Antoon and the Ogba brothers appealed. We address Antoon's claims first, followed by the Ogba brothers' claims.

II

Antoon alleges three errors with respect to Rhonda Smith's testimony. First, he argues that the court abused its discretion in refusing to provide Defendants with a copy of the colloquy between Smith and the judge. Second, he contests the court's refusal to admit an e-mail about Smith into evidence.

---

[8] Not all Defendants were included in all counts. See supra note 1.

Finally, he argues that the case should be reversed due to "cumulative errors" regarding Smith's testimony. Antoon's attorney objected to the court's rulings that he challenges on appeal.

Soon after her direct examination had begun, Smith asked to speak with the judge in private. Smith provided the judge with an e-mail from a head Federal Defender to an Assistant Federal Defender – an attorney working on Smith's case at the time. It indicated that the prosecution was concerned that Rhonda's sister wanted Rhonda to be in a mental institution and that Rhonda was now claiming that she was not guilty despite having pled guilty. The e-mail also indicated that the prosecutor "will see that she gets a competency exam compliments of the fed. prison system if she checks herself in anywhere," suggesting that the Government would threaten Rhonda with more recommended prison time if she checked into a mental institution. The response stated,

> She is a special case, that's for sure. I wasn't aware that she is now claiming she's not guilty. I talked with her very briefly this afternoon . . . . She mentioned that she needed to go back into the hospital. Her psych records from the 1970's indicate that she was feigning symptoms of schizophrenia in order to excuse her behavior. . . .

In Smith's colloquy with the court about the e-mail, she expressed various concerns to the judge, suggesting that she was on drugs when she signed the guilty plea, that she felt threatened by the prosecution, that her attorneys were not competent, and that the Government's practice cross-examination, where an attorney asked questions that the Defense was likely to raise, scared her.[9] The

---

[9] Smith, in the colloquy with the judge, made several statements suggesting that she was afraid of the prosecution. Near the beginning of the colloquy she said, "And I feel Bill [McMurrey, one of the prosecutors] threatened me. . . . By telling them [the Office of the Public Defender] that if I go to the [mental] hospital, that he was going to make sure I get a competency examination compliments of the federal prison system." Later she said, "If I said something they [the Government] didn't agree with, you know, I felt intimidated. . . . I just

judge reminded Smith that she did not have to testify and asked her if she had not wanted to enter a guilty plea when she did so.[10] Smith stated that she did want to testify and that she had intended to plead guilty.

A court reporter took down the conversation. Antoon's attorney requested a copy of the transcript of the colloquy. The judge indicated that he wanted to

---

would ask questions, like yesterday I asked Ms. Priest [one of the prosecutors] about attorney/client privilege, and she told me that was a strong allegation and that why would you want to have three people that is against you, and I need to choose my battles wisely." She again brought up the mental hospital issue, stating, "And he [Bill McMurrey] mentioned something about having to get a competency examination. . . . after [I pled guilty]." The judge asked, "So you thought you were going to be put in prison to get examined? That is the threat that you took from that?" to which Smith responded, "Yes, sir. I took that they didn't want me taking my medication any longer." She also said that "when being questioned Mr. McMurrey [one of the Government's attorneys] came in to pretend like he was the Defendants' attorney . . . and then he got to my mental health, and he said that he was telling me I don't have a problem. . . . When he was doing the questioning saying what the people might ask me, instead of just saying, 'Don't tell them you got a mental health problem,' you know, being direct about it, it was just putting it in other ways and how for me to answer better." Furthermore, she told the judge that a week before trial, when she "was being kind of difficult" and claimed that she had never seen the plea agreement, Agent Meadows told her, "'Well, I hope you know you just added three more years to your sentence.'" Finally, she stated that she was scared of what the Defense would ask her based on the e-mail, "Like if I felt threatened or intimidated by the Prosecution. . . . I felt that if I answered it and it was against the Prosecution, then that is not helping."

[10] The judge explained to Smith that she had to testify truthfully, and that "[u]ltimately the judge will make [the sentencing] decision." The judge concluded,

> It seems to me like you are still having a little bit of concern about being up here testifying, so the only thing I want to advise you of, you have the right not to be here. That is a decision you need to make, but you need to make it after talking to your attorney and then make that decision. And you understand the consequences, because I think you understand full well what is going on, and that is you signed an agreement with the Government and they are expecting some help from you. You gave them some help because you talked to them, and that is part of the help they wanted, but I am sure part of the agreement was also you come to court and testify. But you don't have to go through with it if you decide it is not in your best interest or you decide for some other reason you don't want to do that.

hear Smith's testimony again before responding. The next day, the judge concluded,

> This [the colloquy] is not information that the Government has, so I don't think – You can cross examine her, but I don't want you cross examining her on what you [sic] she told me yesterday. It went to a different issue and I don't think it is anything that is proper for you to inquire into. If I thought it was appropriate I would let you have it, but it is not.

The court overruled Ogba's attorney's complaint that the failure to provide the colloquy to the parties violated "the right to confront and cross examine the witness and effective assistance rule." In refusing to admit the e-mail as substantive evidence, the court questioned its relevance and found that it was hearsay and work product. The judge stated, "you are trying to show she has a motive to testify in favor of the Government. . . . you have already got that out to the jury. . . . She told me she didn't get this email until June. Obviously it didn't impact her plea of guilty at all. . . . Why she thinks she has to testify, that is fair game [for cross examination] in terms of the Government." When the Defense again tried to introduce the e-mail as an exhibit, the court stated, "I think it is hearsay and work product. I don't know what makes it admissible that takes it out of the hearsay context." The judge also considered and appeared to accept the Government's argument that the e-mail was protected by the attorney-client privilege, a privilege that Antoon points out may not be invoked by a third party, but it based its ruling on hearsay and lack of relevance.

Defendants argue that the e-mail is not hearsay because it was not offered for the truth of the matter asserted, but rather "to show the jury what Ms. Smith had seen, and to illustrate to the jury why Ms. Smith would have a motive to please the government by testifying less than truthfully." Although the e-mail may not have been offered for the truth of the matter asserted, the court did not abuse its discretion in finding that the e-mail was not relevant, as Smith saw the

e-mail after she had signed her plea. Although seeing the e-mail might have affected her motive to please the government, the court allowed the defense to cross examine Rhonda about her reaction to seeing the e-mail and how the e-mail affected her motive to testify, stating, "She already made her plea and factual resume and that agreement was before this email, so whatever happened there happened, and whatever has happened since then, whatever the motive you can get into that, but this letter just doesn't have anything to do with that plea and being coerced back at that time."

Antoon argues that we should review de novo the district court's refusal to provide the colloquy to the parties, as this was exculpatory Brady material,[11] and review for an abuse of discretion the court's refusal to admit the e-mail as substantive evidence. Antoon likens Smith's colloquy to a presentence report containing exculpatory information, including Smith's evidence that "[s]he had a long history of mental illness," "her guilty plea had been involuntary," "she was not guilty of healthcare fraud," "[s]he only pleaded to escape immediate incarceration," [t]he prosecutors encouraged her to be untruthful about her history of mental illness," and "[t]he government would cause her sentence to increase if she testified truthfully." Even if on de novo review this information were Brady material, the court did not err in refusing to provide it. As in

---

[11] Antoon cites United States v. Jackson, 978 F.2d 903, 909 (5th Cir. 1992) and its holding that " a defendant ordinarily has a right to exculpatory or impeachment material that is contained in the presentence reports of his co-defendants." The Government argues that because the Government did not have possession of the colloquy, Brady does not apply. Although Brady does not apply in the traditional sense because the Government did not have possession of exculpatory information that it should have disclosed to the defense, Antoon is correct in arguing that Jackson applied Brady to material in the court's possession and held that, for a presentence report, "the district court should examine the report in camera and release any exculpatory or impeachment material to the defendant while protecting the confidentiality of the rest of the report." Id. Although the material in this case was of course not a presentence report, it was information related to a co-defendant in the case. The court examined the material in camera and concluded "I don't think it is anything that is proper for you to inquire into."

Jackson, the defendants "already had access"[12] to information that was nearly identical to the information in the colloquy and e-mail, and it said nothing of Antoon's culpability or motives; it was "favorable"[13] to Antoon only because it spoke to Smith's credibility and her motivations to testify, all of which were revealed on cross.

Antoon concedes that much of what Smith said to the judge in private came out on cross examination, but he argues that a material portion of this discussion was not revealed on cross: she was afraid that if she testified truthfully, the government would increase her sentence. We cannot agree. The key components of both the e-mail and the colloquy that were relevant to Smith's credibility as a witness and were potentially exculpatory, including her fear of a higher sentence for failing to testify consistently with the Government's theory, were disclosed in her testimony before the jury. Furthermore, prior to trial, the defense was aware of concerns nearly identical to those discussed in the e-mail and the colloquy. As discussed below, the defense had a videotape of a discussion that Smith had with her landlord, wherein she expressed concerns that if she testified truthfully, her sentence would increase. The videotape also had information that raised the same credibility issues as those allegedly contained in the e-mail.[14]

---

[12] Jackson, 978 F.2d at 909.

[13] Id.

[14] When arguing for the admission of the e-mail, Antoon's attorney stated, "[W]e think it does explain her motivation for testifying that she is fearful of the Government, she is afraid her own lawyer is selling her down the river . . ." Antoon's attorney had identical information, from the videotape, before trial and revealed this information on cross. On cross, Antoon's attorney asked Smith, "Now, toward the end of your conversation with Mr. Martin, did you . . . express to him a concern that you were going to be arrested again and thrown in jail?" Yes." "And in fact that is exactly what happened to you, wasn't it?" "Yes." "I mean, you are in jail right now, aren't you, Ms. Smith?" "Yes." "And at the end of the conservation [on the videotape] did you express a concern, a fear about the fact that your lawyer you felt like was selling you down the river, essentially?" and Smith responded, "Yes."

On cross, the defense elicited Smith's claims that she was not familiar with the text of the factual resume that she signed, that the Government had arrested her in a mental institution, that her attorney said that she had "no choice but to plead guilty," that she believed she was not guilty, and Smith's fear that if she testified inconsistently with the Government's theory or indicated that she felt threatened by the Government, the Government would increase her sentence.

Ogba's attorney asked Smith, "Now, you entered a plea agreement with the Government in this case, and that was after they came and arrested you in the mental health facility and brought you back in custody to Dallas. Is that right?" She replied, "Yes." Antoon's attorney asked Smith, "So you met with the Prosecution to discuss your testimony almost every day since you said the 2nd of October, ma'am. Is that correct?" Smith responded that she did, and that she met with them "[a]bout six hours each day. . . . For three, four times a week; three – At least four at the most." Antoon's attorney then asked, "And so that the jury clearly understands this, this is something that you had agreed to do as part of your plea agreement with the Government. Correct? . . . Meeting with the Government and cooperating with the Government was something that was part of your plea agreement when you pled guilty. Correct?" to which Smith responded in the affirmative. "And in fact, Ms. Smith, part of your plea bargain with the Government was that if you cooperate with the Government, that they may go to the judge and file a motion so that you can get less time in the penitentiary. Correct?" "Yeah, that is what it says." "And in fact, your sentencing has been postponed so that your sentencing will occur after you testify in this courtroom before this jury. Isn't that correct?" Yes." Antoon's attorney then asked, "So you agree to plead guilty, you agree to cooperate with the Government, and the next day you are released from jail. Is that correct, Ms. Smith?" "Honestly I cannot say I agreed to do anything. I did what I was told to

do." "So the jury understands that, you did what you were told to do. Your lawyer told you to plead guilty. Correct?" "Yes." "And in fact, Ms. Smith, isn't that the only reason that you pled guilty?" "Yes." "And in fact, isn't it true that you don't believe you are guilty of these charges?" "Yes." Later, Antoon's attorney asked Smith if she had told someone at church that Smith was "being made to tell lies in a case that you were involved in as a witness." Smith responded that she hadn't, but that she told the woman "that I was very uncomfortable with the Government because I felt that I had been threatened. I was refused to continue my mental health treatment as the judge had ordered me to do."[15]

Smith's testimony about a videotaped conversation that she had with her landlord also disclosed her belief that her attorney, "and his investigator, too," wanted her to testify "[t]hat I paid them [doctors that I worked with] money for CMNs instead of appointments. They want me to testify that this was a scam, and each person participated in it from the beginning willingly, knowing this was a scam, and that way we was aiding and abetting each other to defraud the government and pay me back my [sic] paying illegal kickbacks to the doctor." Smith acknowledged that she had responded affirmatively to her landlord's statement that "they got you to plead guilty and they said that they would be easy on you if you would cooperate with them, and your attorney told them they [sic] [you] had to tell them what they wanted to hear whether it was the truth or not."[16] And finally, she acknowledged that she said, "[w]hen I was in jail and my attorney came up there, I said, 'That is what they told me to say. If you plead guilty, you have to be willing to tell them everything they want to hear. You cannot say, 'Yeah, I paid the doctor money but I didn't know it was illegal, or I

---

[15] Emphasis added.

[16] Emphasis added.

paid the doctor for patient/doctor appointments and not CMNs.' So basically what they're wanting me to say is I paid for CMNs and not appointments." Finally, she acknowledged that in response to her landlord's question, "Bill McMurrey was trying to get you to say stuff that you don't think was the truth? He wanted you to say it the way he wanted it rather than the way you wanted to say it?" Smith stated, "This is what they did. They said, they kept '–something –' [asking] me did Doctor Antoon get paid for every patient he saw and I kept saying yes."

Ogba's attorney asked similar questions of Smith. He asked, "And then when you would do something or say something or communicate with your attorney and have your attorney pass things on to the Government that maybe didn't go their way, was there a complete difference on how you were handled and treated?," to which Smith responded, "Yes." "You would get locked up, threatened, all sorts of things would happen to you when you didn't do things the way they wanted you to?" "Yes."[17]

These trial events make plain that the court did not err in refusing to disclose the contents of the colloquy to either party and did not abuse its discretion in failing to admit the e-mail into substantive evidence.

Antoon further argues that the court abused its discretion in permitting the Government's case agent Meadows to use a summary chart that showed a conspiracy between Smith and Antoon. He argues that "the government assumed that Rhonda Smith and Dr. Antoon had conspired together, when, in fact, the testimony concerning this issue was at best contradictory." We are not persuaded.

> [A]llowing the use of charts as "'pedagogical' devices intended to
> present the government's version of the case" is within the bounds
> of the trial court's discretion to control the presentation of evidence

---

[17] Emphasis added.

14

under Rule 611(a). Such demonstrative aids typically are permissible to assist the jury in evaluating the evidence, provided the jury is forewarned that the charts are not independent evidence.[18]

The court in its general instructions to the jury explained that charts are not evidence, stating,

> Certain charts and summaries have been shown to you solely to help explain the facts disclosed by the books, records, and other documents which are evidence in this case. These charts and summaries are not evidence or proof of any facts. You should determine the facts from the evidence.[19]

_____

[18] United States v. Taylor, 210 F.3d 311, 315 (5th Cir. 2000).

[19] The instructions also made it clear that the jury had to find specific proof to convict Antoon for conspiracy, stating,

> For you to find a defendant guilty of this crime [conspiracy], you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> First: That the defendant and at least one other person made an agreement to commit the crime of health care fraud, pay or receive remuneration to induce patient referrals, or engage in illegal monetary transactions as charged in the indictment;
>
> Second: That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and
>
> Third: That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy. . . . Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.

15

Summary charts are properly admitted only if "they accurately reflect the underlying records or testimony, particularly when they are based, in part, on the government's factual assumptions."[20]

The Government's "organizational chart" summarized, among other items, the dates of the doctors' involvement in the scheme, Antoon's billing history, and total amounts of money transferred between the co-defendants and the doctor. It had dotted lines indicating agreements and money transfers between Antoon and other co-defendants in the case. Meadows referred to the chart while testifying, stating,

> This line indicates money going directly from Chuck Ogba to Doctor Antoon, as well as a handshake agreement . . . You have got the dotted line represented from Iffy Ogba and Doctor Antoon, and that represents basically the fact . . . the agreement that Doctor Antoon had was an agreement with Apex Medical Services . . . . You have got Rhonda Smith down here. . . . Rhonda Smith and Doctor Antoon had an agreement. . . . And then you have got the money line where Rhonda Smith paid money to Doctor Antoon.

The government presented sufficient underlying evidence to prove the existence of an agreement between Antoon and Smith, including a recording of Antoon and Smith discussing payments for signed CMNs, and Smith's testimony about a meeting with Chuck, Antoon, and Smith, where Smith asked how she should pay Antoon and the parties agreed that she would pretend that the payments were charitable contributions.[21]

---

[20] Taylor, 210 F.3d at 315.

[21] Antoon also points to testimony that indicates an agreement but argues that "[o]n cross-examination . . . Smith began to sing a different tune." The existence of conflicting testimony may weaken the strength of the evidence but does not indicate that the Government failed to produce evidence of the underlying facts summarized in the chart. Furthermore, the recording of Smith and Antoon's payment session spoke for itself, although Smith's description of the recording of course influenced the jury's interpretation of that meeting.

Attorneys' questions relating to the chart and to the agent's summary testimony also tested the chart's accuracy and made it clear that the chart was a summary, not evidence. Iffy's attorney on cross examination questioned the validity of the agent's conclusions as follows:

Q. Well, let's talk about this . . . where you . . . have a handshake agreement between Iffy and Doctor Antoon. . . . And you stated the reason you did so is because Iffy owned Apex.

A. Yes, sir, and an understanding was reached between Doctor Antoon and Apex.

Q. Well, you knew that the person who ran Apex was Rhonda Lambert Smith?

A. I knew she ran it for Chuck and Iffy.

* * *

Q. You don't have any evidence that Iffy even knew Doctor Antoon, number one. Isn't that true?

A. Iffy had an understanding with Dr. Antoon.

Q. Agent Meadows, did Iffy Ogba ever meet Doctor Antoon?

A. I believe he went down to meet with him on the first occasion, but I don't think that they ever met.

Q. Okay. . . . They never met, did they?

A. Not to my knowledge.

Antoon's attorney did not question Meadows about the chart but extensively cross-examined him on his conclusions about Antoon's alleged transactions and meetings with Smith and other of UHS's recruiters.[22] The jury

---

[22] Antoon's attorney asked the agent, for example, "Now, after Doctor Antoon told you that Rhonda Lambert had approached him at church and was trying to once again get him to

instructions and the cross examination in this case made it clear that the chart and the agent's summary testimony were a summary and nothing more. The court's admission of the evidence was not an abuse of discretion.

Antoon argues that the cumulative "errors" of the court's failure to provide the plea colloquy or admit the e-mail into evidence, as well as its admission of a summary chart showing a conspiracy between Smith and Antoon, require reversal. As we have found none of these to be errors, we are not persuaded. We now move to the Confrontation Clause violation arising from Meadows' testimony.

## III

Antoon urges that the trial court abused its discretion in admitting Agent Meadows' hearsay evidence about statements that wheelchair recipients made to him as a violation of the Confrontation Clause; he preserved his argument by objecting at trial. The Government agrees that it violated the Confrontation Clause, but argues that the violation was harmless error.[23]

In arguing that the error surpassed the "harmless" threshold, Antoon alleges that "the significance of this error is compounded by the fact that Dr. Antoon was, in effect, fighting with 'both hands tied behind his back'" because the trial was in Dallas, and he could not bring in sick and elderly patients from Arkansas to testify that they needed the wheelchairs prescribed by Antoon. At oral argument, Antoon's attorney emphasized that the evidence was a core component of the government's case against Antoon, since the Government only

---

evaluate these patients, did he indicate to you that he agreed to see those patients?" "Yes, sir." "And did he tell you that he had to block off time to try to see the patients?" "Yes, sir." "Do you recall whether or not Doctor Antoon told you that he had insisted that Rhonda Lambert screen these patients to make sure they had . . . a medical necessity for a power wheelchair?" "Yes, sir."

[23] See, e.g., United States v. Pryor, 483 F.3d 309, 312 (5th Cir. 2007) ("Confrontation Clause objections that were properly raised at trial are reviewed de novo, subject to harmless error analysis." (quotations omitted)).

presented two witnesses, out of a total of approximately 71 potential witnesses, who testified that they could walk and had never owned a wheelchair yet had received wheelchair prescriptions from Antoon. The Government argued in response that Antoon's prescription of medically unnecessary wheelchairs was not the heart of its case, and that it brought in only two witnesses to testify about Dr. Antoon because all of the counts in the indictment were based on those witnesses. The core of its case, argued the Government, was that Antoon received kickbacks for prescribing wheelchairs, and that the brothers paid him only when his prescriptions were successful. The Government argued that the fact that Antoon may have prescribed wheelchairs to patients who did not need them was ancillary to its case and unnecessary for a conviction.

We must "'be convinced beyond a reasonable doubt that the error was harmless in light of the other evidence presented at trial.'"[24] The evidence that Antoon prescribed electric wheelchairs to patients who didn't need them supported the fraud counts, but a jury could have convicted Antoon without it. The core of the Government's case was its argument that Antoon received illegal kickbacks, and the strongest evidence supporting its case was Smith's recording of a payment session with Antoon. This is the beginning, not the end, of our inquiry.

In its opening argument, the Government focused on Antoon's and other doctors' receiving payments only for CMNs that resulted in wheelchair orders, stating,

> Now, the doctors knew that they weren't supposed to be accepting kickbacks, because, you see, if a doctor can submit a claim to Medicare, they have to go through a process and paperwork where they are specifically told, "Hey, here is what a kickback is and you can't accept it." There is evidence that the doctors in this scheme, Dr. Lloyd McGriff and Dr. Patrick Antoon, had seen those forms

---

[24] United States v. Bell, 367 F.3d 452, 468 (5th Cir. 2004) (quoting United States v. Vejar-Urias, 165 F.3d 337, 340 (5th Cir. 1999)).

because they couldn't have gotten the Medicare number without it. Nevertheless, they accepted cash kickbacks for the certificates of medical necessity that they signed. . . . Let's talk about what happened if Medicare denied a claim. It might be that a Medicare beneficiary had already received a wheelchair from another one of those scams. What happened? . . . The doctor had to give his kickback back to Chuck and Iffy. Because, you see, Chuck and Iffy weren't making any money if Medicare didn't pay, so the doctors, the recruiters, they all had to give their money back.

The Government also focused on the CMN kickbacks in close, arguing,

I want to talk a little bit now about healthcare fraud. . . . First and foremost was the paying and receiving of illegal kickbacks that allowed Medicare to have to pay for these fraudulent K-11 power wheelchairs. You are going to hear that the kickback is an independent criminal offense. . . . But it is also healthcare fraud. . . . Because Medicare would not have paid out these claims if it had known about the kickbacks or the payments Doctor Antoon and Doctor McGriff were receiving. . . .You heard Rhonda Smith testify that she paid Doctor Antoon cash in his private office with no one else around. . . . Also, ladies and gentlemen, listen to the tape. That is probably the best single piece of evidence the Government has to show that Doctor Antoon was taking these cash payments for and only for to induce referrals. . . . And it wasn't for every single CMN and every patient that was signed. It was a give and take process, . . . Pay the cash, you pay for the CMN, and you deduct for those claims that Medicare did not pay.

That said, the Government also relied on evidence that Antoon signed off on CMNs when wheelchairs were not medically necessary. As Antoon points out, the Government argued in closing,

Most of the provisions here to [sic] crimes for which these Defendants have been charged with involve knowingly and willfully. Knowingly is just intentionally. It is not by mistake or accident. . . . What intentionally means is basically to voluntarily and purposefully with some sort of specific intent to commit fraud; basically some act – doing something to disregard the law or to do something the law forbids. An example, as I just gave you involving Doctor Antoon–the lying, misrepresenting on the CMN saying these patients needed wheelchairs when they really didn't. Excuse me.

20

> Not needing wheelchairs, but saying they used wheelchairs when they really didn't tell Doctor Antoon that.[25]

Two elements of the case persuade us beyond a reasonable doubt that the Government's Confrontation Clause violation was harmless error. First, even for the portion of the case involving Antoon's prescription of unnecessary wheelchairs, the Government presented overwhelming non-hearsay evidence that unnecessary prescriptions occurred. Meadows testified that he observed twelve patients who did not appear to require a wheelchair but had received a wheelchair prescription from Antoon, and he presented photographs of these patients and their wheelchairs or scooters, several of which were still in their plastic wrapping.[26] Furthermore, the indictment counts against Antoon were based on two patients, Lee Otis Burks and Floyd McGhee. McGhee verified on

---

[25] The Government also relied on the evidence of prescriptions of unnecessary wheelchairs to support its requested deliberate ignorance instruction, although the court did not accept this rationale for the instruction. See infra note 29.

[26] For example, Meadows testified, "Exhibit No. 159 is a photograph of Gloria Harrison. She is a resident of Arkansas and I believe one of Doctor Antoon's regular patients. I know he was the prescribing physician for a K-11 power wheelchair. . . Medicare paid Universal Health Services for a K-11 power wheelchair. She received a scooter." The Government attorney stated, "there appears to be some wrapping still on the piece of equipment." Meadows replied, "Yes, sir. It is the wrapping that the wheelchair is delivered in." For Exhibit 162, Meadows testified that Viola Brown made one visit to Antoon and received a prescription for a K-11, which Medicare paid UHS for. He showed a picture of her with a scooter, and with a K-11 in her closet. Meadows testified that Betty Henderson, who received a prescription for a K-11 from Antoon, was by his observation "ambulatory." Exhibit 166 was another picture of a K-11 in its plastic wrapping in a storage shed. Meadows testified that Antoon prescribed the wheelchair to Ethel Walker, and that he saw her walk "from her front porch over to her storage building." Exhibit 168 was a photograph of Cozetta Williams' power scooter. Meadows testified that Antoon had prescribed a K-11 for Williams, and responded "yes" to the question of whether she appeared "to be ambulatory." He testified that A.C. Grissom, for whom Antoon prescribed a K-11, did not have a wheelchair ramp into his residence and that "[h]e was ambulatory." He also showed a picture of a dumbbell owned by Mr. Grissom and a photo of Mr. Grissom's K-11, with "plastic on it" and "some bedding stacked up on it." He showed a photo of Eugene Lee, another patient for whom Antoon prescribed a K-11, standing on the steps by his home. He testified that the home had no wheelchair ramp and that "he was ambulatory."

direct that the questionnaire in Antoon's patient file on McGhee indicated that McGhee had told Antoon that he had used a wheelchair. McGhee stated on redirect, "But I don't use a wheelchair. I never have had a wheelchair – When I went to him I had never sat in a wheelchair, less own one." Lee Otis Burks testified that when he goes to the store, "I drive my car or walk" and that he had never used a wheelchair, manual or motorized. Antoon prescribed K-11's for Burks and McGhee.

Second, the Government presented other non-hearsay evidence of healthcare fraud, receipt of illegal payments, and intent to do both, which was unrelated to Antoon's prescribing electric wheelchairs for patients who were ambulatory. The Government presented evidence that Antoon billed Medicare for the visits where he prescribed wheelchairs, in addition to receiving money from Universal. With respect to the payments Antoon received from Universal, the Government played a recording of Smith counting out cash for Antoon, where Smith explained that they counted the patients for whom $200 would be paid and the CMNs for which Universal would not reimburse Antoon because Medicare had denied the claims. Smith also testified that at a meeting with Chuck and Antoon, after Antoon had refused to do business with Universal/Apex but had agreed to start up again, she asked "How do I pay Dr. Antoon. . . . 'I asked . . . do I go to the office and pay at the front desk?' And Doctor Antoon kind of looked at Chuck, and Chuck said to go say it is a charitable donation or something to that effect." The Government attorney asked, "Okay. Now, this bit about 'here is your cash for charity,' is that what you were supposed to say?" Smith responded, "Yes." "Would you do that when you went in to pay Doctor Antoon?" "Several times."[27] In light of the non-hearsay evidence presented at

---

[27] Antoon argues that Smith lied, but Antoon's attorney cross-examined Smith thoroughly on Smith's description of the recording and numerous factors that may have affected Smith's credibility; the jury had plenty of evidence from both sides to determine Smith's credibility and to weigh her testimony accordingly.

trial on health care fraud, we are convinced beyond a reasonable doubt that the Confrontation Clause error was harmless.

IV

Antoon argues that the court erred in giving a deliberate ignorance instruction to the jury. The instruction stated,

> The government may prove that a defendant acted "knowingly" by proving, beyond a reasonable doubt that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. No one can avoid responsibility for a crime by deliberately ignoring what is obvious. A finding beyond a reasonable doubt of an intent of a defendant to avoid knowledge or enlightenment would permit the jury to find knowledge. Stated another way, a person's knowledge of a particular fact may be shown from a deliberate or intentional ignorance or deliberate or intentional blindness to the existence of that fact. It is, of course, entirely up to you as to whether you find any deliberate ignorance or deliberate closing of the eyes and any inferences to be drawn from any such evidence. You may not conclude that a defendant had knowledge, however, from proof of a mistake, negligence, carelessness, or a belief in an inaccurate proposition.

Antoon objected to the instruction, so we review for an abuse of discretion.[28] The court overruled the objection, finding that Antoon had a "contract with Medicare that says you can't collect anymore [sic] than your deductible and your copay, and he collected."[29] "While a 'deliberate ignorance' instruction should rarely be given, a deliberate ignorance instruction is justified where 'the evidence shows (1) subjective awareness of a high probability of the

---

[28] See United States v. Nguyen, 493 F.3d 613, 619 (5th Cir. 2007).

[29] The court rejected the Government's theory for the deliberate ignorance instruction. The Government's attorney argued that "there is a deliberate ignorance on Doctor Antoon's part that it is clearly obvious that these people didn't need wheelchairs, but he is signing on the prescriptions."

existence of illegal conduct and (2) purposeful contrivance to avoid learning of the illegal conduct.'"[30]

To show subjective awareness, the Government must "'present[] facts that support an inference that the particular defendant subjectively knew his act to be illegal.'"[31] "Suspicious and erratic behavior may be sufficient to infer subjective awareness of illegal conduct."[32] The Government presented sufficient evidence to show that Antoon knew that his behavior was illegal. For a time, Antoon stopped working for the brothers. Rhonda testified that Antoon stopped doing business with Apex in March 2003 because he "did not feel comfortable doing business" with Apex. Chuck then met with Antoon and Rhonda, and Antoon agreed to re-commence business. As we have discussed, Rhonda testified that when she asked how she should pay Antoon, "Doctor Antoon kind of looked at Chuck, and Chuck said to go say it is a charitable donation or something to that effect." Rhonda also explained that at the meeting, it was agreed that "[i]f Doctor Antoon approved a patient for a motorized wheelchair, if Medicare ultimately denied the claim, that he would be responsible for having that money put back." Rhonda testified that she paid Antoon on Thursdays and Fridays in cash and picked up his CMNs when she paid him, and that "I would go in and he would have the list of names, and he had the CMNs, and he would give those to me, call out the names, count them, and then get paid."

Antoon argues that he thought the kickbacks for referrals were legal because an attorney (Frances Crumpler) had advised him, and an administrative court had agreed, that Antoon could refer Medicare patients to a clinic in which he had an ownership interest; because he served a rural area, he was exempt

---

[30] Nguyen, 493 F.3d at 619 (quoting United States v. Threadgill, 172 F.3d 357, 368 (5th Cir. 1999)).

[31] Id. (quoting United States v. Lara-Velasquez, 919 F.2d 946, 952 (5th Cir. 1990)).

[32] Id. at 620.

from certain Medicare regulations that prevented self-referrals. But Crumpler's advice related to Antoon's referrals to a clinic, not to his activities with the Ogba brothers. Crumpler testified that he gave Antoon general legal advice from time-to-time, but that he did not remember Antoon, in his legal questions, "mentioning any of the parties that are here present today." Crumpler never informed Antoon that receiving Medicare payments for seeing patients to prescribe a wheelchair and referring them to the Ogba brothers' supply company, or receiving payments from the Ogba brothers for signing CMNs, was legal.

Even if Crumpler had provided this advice, Antoon, in signing his provider contract with Medicare, agreed that he could not collect "from the beneficiary or other person or organization for covered services more than the applicable deductible or coinsurance." Evidence at trial showed that Antoon billed Medicare for the visits where he signed CMNs. Diane Thornton, Antoon's insurance coordinator, testified that Antoon billed Medicare "[a]round $107 approximately" for most wheelchair patients.

The Government also provided evidence to support the second prong of the test for deliberate ignorance, a "purposeful contrivance to avoid learning of the illegal conduct."[33] "Circumstantial evidence can be provided as evidence of purposeful contrivance."[34] As the Government argues in its brief, the court asked Crumpler,

> [W]as there ever any question, then, or seeking of advice from you in terms of, "Yes, I am seeing these patients, and I am charging them, and I am submitting that to Medicare; but besides that, I am getting paid something from these recruiters or these DMEs. Can I accept that money?"

---

[33] Id. at 619 (quotations omitted).

[34] Id. at 621.

After several similar questions, Crumpler responded that Antoon had not asked him this, stating, "Not in the specific context that we have discussed today, no, sir." Although Antoon claimed to have consulted with Crumpler regarding the legality of his actions, he never told his attorney that he was getting kickbacks for signing CMNs or billing Medicare for the CMN visits, or asked if these activities were legal. Nor did he tell his insurance coordinator that he had an agreement with a DME supplier or that he was receiving payments from the supplier. Instead, the Government presented evidence that he recorded his wheelchair visits in a notebook, which he provided to the coordinator only after he was subpoenaed.

Antoon argues that the instruction should not have been given on the basis that Antoon prescribed unnecessary wheelchairs, or on the basis that he should have known that he could not receive payments from Universal. The court, in adopting the instruction at the charge conference, did not base adoption on either of these theories but rather on the theory that Antoon knew that he could not charge Medicare for visits with wheelchair patients but did so anyway. Even if the instruction were based on the alternative theories of unnecessary prescriptions or kickbacks from Universal, the Government showed sufficient evidence of a "conscious action of the defendant"[35] to disregard the truth. As we have discussed, the forms that Antoon signed laid out the medical conditions necessary for prescriptions of wheelchairs. One wheelchair recipient testified that Antoon lied in his records and indicated that the recipient had previously owned a wheelchair, and both recipients testified that they had never owned a wheelchair; the form prohibits prescription of wheelchairs to patients who do not "require and use a wheelchair to move around in their residences." In signing these forms and certifying their truth, Antoon would have had to deliberately

---

[35] United States v. Lara-Velasquez, 919 F.2d 946, 951 (5th Cir. 1990).

ignore the requirements for prescribing a wheelchair. With respect to kickbacks from UHS, the agreement that Antoon entered with Medicare indicated that he could not receive payments, other than co-insurance or deductibles, for the prescription of wheelchairs from an "other person or organization," a category that applies to Universal. As with the wheelchair prescriptions, in signing the agreement, Antoon would have had to deliberately ignore the clear prohibition against receiving payments other than co-insurance or deductibles. The Government met its burden of showing Antoon's subjective awareness of illegality and a "purposeful contrivance" to avoid learning whether his conduct was illegal. Ignorance of these texts shows a conscious effort to avoid the truth.

Finally, Antoon argues that the instructions might have confused the jury and "likely gave the jury the erroneous impression that it was appropriate to find Dr. Antoon guilty if he 'should have known' that he was precluded from receiving the $200 payment from the durable medical equipment provider." The instructions warned the jury against this type of finding, stating, "You may not conclude that a defendant had knowledge, however, from proof of a mistake, negligence, carelessness, or a belief in an inaccurate proposition." Elsewhere, in the illegal remuneration count, the instructions required that the "defendant acted knowingly and willfully when he received . . . [the] remuneration." The court did not abuse its discretion in giving the deliberate ignorance instruction.

V

Antoon argues that his convictions under the health care fraud and illegal remuneration statutes are multiplicitous. "A claim that convictions are multiplicitous cannot be raised for the first time on appeal; such a claim must be raised by motion before trial."[36] Antoon failed to object to the indictment as

---

[36] United States v. Dixon, 273 F.3d 636, 642 (5th Cir. 2001).

27

multiplicitous before trial and forfeited the claim. Antoon did not object to his sentence as multiplicitous during sentencing, so we review for plain error.[37]

A challenge to multiplicity invokes the Double Jeopardy Cause, which protects "'against multiple punishments for the same offense,'"[38] where Congress has not authorized cumulative punishment for one offense.[39] For double jeopardy to attach, the "successive punishment at issue" must be a "'criminal' punishment," as determined by the face of the statute,[40] as "[t]he Clause protects only against the imposition of multiple criminal punishments for the same offense."[41]

Where, as here, there is not a "clear indication" of legislative intent to permit cumulative punishment for one offense under two separate statutes,[42]

---

[37] Id.

[38] Whalen v. United States, 445 U.S. 684, 688 (1980) (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969)).

[39] Id. at 688-89.

[40] Hudson v. United States, 522 U.S. 93, 101 (1997).

[41] Id. at 99 (quoting Helvering v. Mitchell, 303 U.S. 391, 399 (1938)).

[42] Missouri v. Hunter, 459 U.S. 359, 367 (1983) (emphasis omitted) (quoting Albernaz v. United States, 450 U.S. 333, 340 (1981)). We find no language in the statutes or their legislative history suggesting an intent to allow conviction for illegal remuneration and health care fraud based on a charge of illegal remuneration arising from one act. If anything, the legislative history suggests that receipt of illegal remuneration is a subset of healthcare fraud, as it appears under the section entitled "Application of Certain Health Antifraud and Abuse Sanctions to Fraud and Abuse Against Federal Health Care Programs." P.L. 104-191, 1996 H.R. 3103 at 1999. In the few federal appellate cases that have addressed convictions and sentencing for health care fraud and illegal remuneration, the health care fraud was based on charges other than illegal remuneration, including submission of Medicare and Medicaid claims for services that were "not covered, not ordered by a physician, not provided by qualified persons, and/or not provided at all," United States v. Jackson, 220 Fed. Appx. 317, 322 (5th Cir. 2007) (unpublished), cert. denied, 128 S.Ct. 122 (2007); inflated cost reports, United States v. Miles, 360 F.3d 472, 475 (5th Cir. 2004); United States v. Hamilton, 440 F.3d 693, 695 (5th Cir. 2006) (per curiam); and charging Medicare for unnecessary therapy, United States v. Goli, 69 Fed. Appx. 338, 338 (8th Cir. 2003) (unpublished).

and the punishments are criminal, we apply the Blockburger test. Under Blockburger,

> where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.[43]

Blockburger is a "'rule of statutory construction,'"[44] so we must look to the text of the statutes. The two statutes at issue address illegal remunerations and health care fraud. 42 U.S.C. § 1320a-7b(b)(2)(A) provides criminal penalties for

> (b) Illegal remunerations.
>   (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
>     (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

18 U.S.C. § 1347 (healthcare fraud) provides,

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice--
>   (1) to defraud any health care benefit program; or
>   (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

---

[43] Blockburger v. United States, 284 U.S. 299, 304 (1932) (citing Gavieres v. United States, 220 U.S. 338, 342 (1911)).

[44] Hunter, 459 U.S. at 367 (quoting Albernaz, 450 U.S. at 340).

On their face, the statutes each require proof of an additional fact that the other does not. Illegal remuneration does not require fraud or falsity; a defendant could be honest about accepting illegal remunerations. Health care fraud, on the other hand, requires fraud or falsity but does not require payment in return for a referral. An individual could commit health care fraud in numerous ways, as the Government argued at trial: receiving illegal kickbacks, receiving payments from Medicare in addition to coinsurance and deductibles after having agreed not to do so, prescribing wheelchairs that are not medically necessary while certifying that they are necessary, and a doctor's certification that he is the patient's regular provider, while in fact he has seen the patient only once for a wheelchair prescription. In short, health care fraud requires some type of deceit, while illegal remuneration does not. Illegal remuneration requires kickbacks for referrals, whereas healthcare fraud, depending on how it is charged, does not.

But we may not stop here. Under Blockburger we must look to the proof required for each necessary element of each offense in the case. In Gavieres v. United States, the Court, applying the test later adopted in Blockburger,[45] asked not only whether each statute required proof of an additional fact that the other did not, but also whether "the offenses charged [under the statute], and of which a conviction has been had in the municipal court and in the Court of First Instance, [were] identical [sic],"[46] looking to the "charge contained in the record."[47] The Court followed a similar path in Whalen, where a defendant was charged with rape and felony murder. The Government argued that the felony

---

[45] See Blockburger, 284 U.S. at 304.

[46] 220 U.S. at 342.

[47] Id.

murder statute, on its face, did not necessarily require proof of rape: a murder committed in the course of robbery, kidnapping, or arson, for example, is a felony murder. As a result, the Government argued, conviction for rape required proof of an additional fact not required for felony murder. The Court rejected this argument, looking specifically to the necessary elements to be proved under the statutes as charged and holding that,

> Where the offense to be proved does not include proof of a rape -- for example, where the offense is a killing in the perpetration of a robbery -- the offense is of course different from the offense of rape . . . . In the present case, however, proof of rape is a necessary element of proof of the felony murder, and we are unpersuaded that this case should be treated differently from other cases in which one criminal offense requires proof of every element of another offense.[48]

Thus, if Antoon's healthcare fraud conviction were based entirely on proof of his receipt of kickbacks, which he did dishonestly, then a conviction for illegal remuneration is a lesser included offense of healthcare fraud; building from the illegal remuneration conviction, the only additional element necessary for the health care fraud conviction is fraud or falsity. But if a jury convicted Antoon for other types of fraud, unrelated to illegal remuneration, and the court sentenced Antoon based on that conviction, there is no double jeopardy.

This case differs from Whalen because there, the Government did not charge the defendant under multiple theories of felony murder, such as rape, arson, and kidnapping. Its charges rested only on murder in the course of a rape. But Whalen's holding applies, as we will explain. The jury charge in the present case included multiple theories of health care fraud, requiring the jury to find beyond a reasonable doubt, in order to convict Antoon of health care fraud,

---

[48] 445 U.S. at 694 (emphasis added).

First: That . . . there was a scheme or artifice to either: a) defraud a health care benefit program; or (b) obtain, based on false or fraudulent pretenses, representations, or promises, money or property under the custody or control of a health care benefit program;

Second: That the defendants knowingly and willfully devised or participated in the scheme or artifice with knowledge of its fraudulent nature and with specific intent to defraud, or that the defendant knowingly and intentionally aided and abetted others in the scheme; and

Third: That the scheme was conducted in connection with the delivery of, or payment for, health care benefits, items, or services. . . .

the indictment also alleges that the scheme to defraud Medicare or to obtain money by false or fraudulent pretenses was committed by one or more of the following methods:[49]

(a) paying or receiving illegal remuneration for the referrals of prescriptions and orders of K0011 power wheelchairs for Medicare beneficiaries;
(b) submitting claims to Medicare seeking reimbursement for the expense of K0011 power wheelchairs and accessories that were inappropriate, in that the power wheelchairs and/or accessories were not medically necessary;
(c) submitting claims to Medicare seeking reimbursement for the expense of K0011 power wheelchairs and accessories that were not furnished or provided to Medicare beneficiaries;
(d) concealing the submission of fraudulent Medicare claims, the receipt and transfer of fraudulently obtained proceeds; and
(e) diverting the fraudulently obtained proceeds for their personal use and benefit. Your determination as to which, if any, of these methods the government has proved beyond a reasonable doubt must be unanimous. That is, to reach a verdict of guilty all of you must agree that the government has proved at least one of the

---

[49] Emphasis added.

methods alleged beyond a reasonable doubt as to each defendant.[50]

Count Sixteen of the jury charge – the receipt of illegal remuneration count – required the jury to find, in order to convict Antoon, that the Government had proved beyond a reasonable doubt,

> First: The defendant received a remuneration (including any kickback, bribe, or rebate), as described in the indictment;
>
> Second: The defendant acted knowingly and willfully when he received that remuneration; and
>
> Third: That one purpose of receiving the remuneration was to induce the recipient to refer an individual for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part by a Federal health care program.

If the jury unanimously agreed, under the health care fraud count, that the Government had only proved part (a) of the charge (paying or receiving illegal remunerations) for Antoon and not the other theories of health care fraud, then Antoon's sentencing, under a conviction for illegal remuneration and health care fraud – illegal remuneration coupled with the specific intent to defraud – violated the Double Jeopardy Clause. Illegal remuneration is a lesser included offense of health care fraud that involves a charge of illegal remuneration committed with a specific intent to defraud. Although part (a) of the health care fraud count does not specify that, in order to pay or receive illegal remuneration, the defendant must have acted knowingly and willfully, the fact that part (a) uses the term "illegal remuneration" indicates that the defendant must have received illegal remuneration as defined by the remainder of the charge, thus including a requirement that the receipt of the remuneration was knowing and willful and done with the purpose of inducing a recipient to refer an individual.

---

[50] Emphasis added.

The jury communicated its verdict through a general verdict form; the form does not indicate which of the health care fraud theories the jury unanimously agreed upon. The Government has argued that kickbacks (illegal remuneration) were the core of its case, and that its strongest evidence was the recording of Antoon receiving kickbacks for signing CMNs. The jury may have based its healthcare fraud verdict only on the illegal remuneration theory, and no others. Without knowledge of the jury's unanimous agreement as to which portion of the health care fraud theory the Government proved beyond a reasonable doubt, we cannot with the requisite certainty say that Antoon's sentence for health care fraud and illegal kickbacks did not violate the Double Jeopardy Clause. Because a sentence based on a conviction on one theory of healthcare fraud (illegal remuneration plus fraud) and a conviction for illegal remuneration, violates the Double Jeopardy Clause, we need not consider the other, non-multiplicitous theories of health care fraud underlying the general verdict.[51] Antoon's sentence of 54 months in prison for healthcare fraud and 54 concurrent months for illegal remuneration is multiplicitous and constitutes plain error.[52] But our inquiry does not end here. An appellate court may not correct an error that the defendant failed to raise in the district court unless there is "'(1) error, (2) that is plain, and (3) that affects substantial rights.'" "'If all three conditions are met an appellate court may then exercise its discretion

---

[51] See, e.g., Griffin v. United States, 502 U.S. 46, 53 (1991) ("[W]here a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground."); United States v. Verbitskaya, 406 F.3d 1324, 1332 (11th Cir. 2005) ("'if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is [legally] insufficient, because the verdict may have rested exclusively on the insufficient ground' reversal is required" (quoting Zant v. Stephens, 462 U.S. 862, 881 (1983)).

[52] Concurrent sentences imposed for a conviction on the offense and the lesser offense are a "cumulative punishment" that violates the double jeopardy clause. Rutledge v. United States, 517 U.S. 292, 301-02 (1996).

to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"[53]

"A defendant's substantial rights are affected if the error affected the outcome of the trial court proceedings."[54]  The district court included all of the counts for which the jury convicted Antoon in rendering the 54-month sentence, which included a $100 special assessment for each count.  On remand, Antoon will receive a different sentence – albeit for the same amount of prison time – and a slightly lower assessment of fees.  Two other circuits have taken a different tact to error arising from concurrent sentences.[55]  We have suggested the same in an unpublished opinion with different facts.[56]  But sentences with special assessments imposed for individual counts are not in fact "concurrent," no matter how small the special assessments.[57]  Nor do we take lightly the

---

[53] United States v. Hoover, 467 F.3d 496, 499 (5th Cir. 2006) (quoting United States v. Cotton, 535 U.S. 625, 631-32 (2002)).

[54] United States v. Villarreal, 253 F.3d 831, 837 (5th Cir. 2001).

[55] See United States v. Gricco, 277 F.3d 339, 351 (3d Cir. 2002) ("We find it unnecessary in this case to decide whether the district court committed [Blockburger] error in entering judgments of conviction and imposing sentences on both offenses. . . . The sentences imposed . . . are concurrent . . . and thus . . . do not increase the length of their incarceration.  The only immediate practical effects of the concurrent sentences . . . are special assessments totaling $700 for each defendant."); United States v. Roberts, 262 F.3d 286, 292-94 (4th Cir. 2001) (holding that "the Sentencing Guidelines stacking rules would have required the district court to impose consecutive sentences upon these defendants that grossly exceeded, in the aggregate, the span of the concurrent life sentences that were actually imposed. . . .  Roberts and Covington have not met their burden of showing that the asserted error affected their substantial rights").

[56] See United States v. Husain, No. 99-21151, 2000 WL 1901408, at *6 (5th Cir. Dec. 5, 2000) (unpublished) (finding that "assuming Husain has shown plain error, it does not appear that he has shown that his substantial rights were violated in light of the fact that the district court sentenced him to a term of seventy-one months on each of the five separate felony convictions - all to run concurrently").

[57] See Ray v. United States, 481 U.S. 736, 737 (1987) (per curiam) (where "the District Court imposed a $50 assessment on each count, in addition to the concurrent prison and parole terms, for a total of $150," the Court held that "[s]ince petitioner's liability to pay this total depends on the validity of each of his three convictions, the sentences are not concurrent"); see

35

collateral effects of sentences, whether concurrent or consecutive.[58]   More importantly, the sentence violates double jeopardy.  And multiplying offenses from conduct in violation of the prohibition of double jeopardy hands prosecutors undue leverage in plea negotiation, frustrating evenhandedness in sentencing and raising the price of trial for accused persons.  Failing to remedy a clear violation of a core constitutional principle would be error "so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice."[59]

## VI

We now turn to Iffy and Chuck's arguments.  The Ogba brothers argue that the indictment is void because "the Constitution for the United States does not authorize the Executive . . . to prosecute any . . . offense which is alleged to be criminal unless the said Act is found in the [e]numerations of the constitution."  They failed to raise this objection before or during trial but only objected to the indictment on the grounds of vagueness and multiplicity, claims that they do not raise here, so plain error review applies.  The superseding indictment charged the brothers under 18 U.S.C. § 1347 for healthcare fraud; 42

---

also Dixon, 273 F.3d at 641-42 (citing United States v. Soape, 169 F.3d 257, 266 n.4 (5th Cir. 1999) (where the district court imposed concurrent sentences and a $100 special assessment for each count, the sentences were not concurrent).

[58] See, e.g., Benton v. Maryland, 395 U.S. 784, 790-91 (1969) (quoting Sibron v. New York, 392 U.S. 40, 55 (1968)) (observing that the "concurrent sentence rule may have some continuing validity as a rule of judicial convenience" but discussing the "'the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences,'" and citing, among other examples, state sentencing enhancements based on prior concurrent felony convictions); United States v. Zalapa, 509 F.3d 1060, 1065 (9th Cir. 2007) (finding that "multiplicious convictions and sentences carry with them significant potential for collateral consequences" and affect substantial rights and the fairness or integrity of the proceedings). Nor are the sentences technically concurrent.

[59] United States v. Fortenberry, 914 F.2d 671, 673 (5th Cir. 1990) (quoting United States v. Graves, 669 F.2d 964, 971 (5th Cir.1982)).

U.S.C. § 1320a-7b(b)(2)(A)) for illegal remuneration/money laundering; and for conspiracy to violate both statutes.

We have held that "it cannot seriously be contended that . . . [Medicare and Medicaid] do not affect commerce."[60]  The provision of medical services "affects interstate commerce because both physicians and hospitals serve nonresident patients and receive reimbursement through Medicare payments,"[61] and the regulated activity in this case substantially affects commerce[62] and is linked to interstate commerce.

The indictment alleged that Medicare "was administered by the Centers for Medicare and Medicaid Services, . . . an agency of the United States Department of Health and Human Services," and that

> [i]n Texas, Medicare Part B was administered by Palmetto GBA, which entered into a contract with the United States Department of Health and Human Services and HCFA [the "Health Care Financing Administration"] to serve as the entity . . . that received, processed, and paid Medicare claims for DME, including, but not limited to, those relating to power wheelchairs and accessories.

The indictment also alleged that "Universal directed all Medicare reimbursement payments to be mailed to . . . Dallas, Texas," that Antoon "practiced medicine . . . in Magnolia, Arkansas," and that Chuck Ogba caused funds to be transferred to El Dorado, Arkansas, to pay Antoon.  These activities all related to the fraudulent conduct charged under the health care fraud statute, as the Government alleged that Defendants illegally requested reimbursement from Palmetto for improper prescriptions, for equipment that they did not deliver, and for "concealing the submission of fraudulent Medicare

---

[60] United States v. Hickman, 331 F.3d 439, 443 (5th Cir. 2003).

[61] Summit Health v. Pinhas, 500 U.S. 322, 327 (1991).

[62] See United States v. Lopez, 514 U.S. 549 (1995).

claims," among others. The evidence presented at trial supported these allegations, showing the movement of money, prescriptions for wheelchairs, recruiters, and requests for reimbursement across state lines. Although Universal operated out of Texas and sent reimbursement requests to Palmetto, a Texas branch of a federal agency, some prescriptions for wheelchairs were faxed from Arkansas to Texas, and Chuck wired some of the funds to pay Antoon and Arkansas recruiters from Texas to Arkansas. Furthermore, Chuck traveled to Arkansas to convince Antoon to re-commence work for the brothers. One brother testified that he traveled to Arkansas "three or four" times to manage the business.

The illegal remuneration statute, like the money laundering statute, "regulates conduct that, in the aggregate, has a substantial effect on interstate commerce"[63] and is linked to interstate commerce. The nexus between the activity regulated and interstate commerce arises because the money illegally obtained was allegedly the product of interstate transactions and of transferring money between states to pay Antoon, recruiters, and other doctors. As we have discussed, these activities involved sending reimbursement claims and CMNs between Arkansas and Texas to a government agency in Texas that contracts with the federal Centers for Medicare and Medicaid Services, formerly the Health Care Financing Administration. Congress had the power to enact the Health Care Fraud and Illegal Remuneration statutes under the Commerce Clause of the Constitution, and offenses charged under these statutes do not fall outside of Congress's constitutionally-granted powers.

## VII

The brothers moved to dismiss the indictment "for failure to state a federal offense [and] for lack of federal jurisdiction." The brothers now argue that the

---

[63] United States v. Meshack, 225 F.3d 556, 572 (5th Cir. 2000) (finding that money laundering has a substantial effect on interstate commerce).

district court erred by continuing to hear the case despite this motion, alleging that the court "had a duty to stop all court proceedings, upon the challenge of Constitutional Jurisdiction" but failed to do so. They also argue that the judge had a "duty 'to show and prove that the offenses alleged to have been committed were 1) secured, 2) protected, or 3) prohibited, by the enumeration found in the United States Constitution." In sum, defendants reassert their argument that the indictment failed to allege an offense enumerated in the Constitution. They expand this argument by concluding that the judge lacked jurisdiction to hear the case.

As we have discussed, the health care fraud and illegal remuneration statutes fall well within Congress's powers under the Commerce Clause, and the indictment alleged criminal violations of federal statutes. The district court had jurisdiction to hear the case.

## VIII

Three of the district court's amended pretrial orders set dates for the filing of pretrial materials and threatened penalties for the failure to timely file, stating, "SANCTIONS will be imposed if these pretrial requirements are not met. If the Government does not timely file the pretrial material, the case will be dismissed." The Ogba brothers argue that the Government failed to submit its pretrial materials in time, and that "it is undisputable that the case was dismissed by Order of the Court." The brothers do not point to an order dismissing the case, as none existed; they argue that since the amended pretrial scheduling orders threatened dismissal for untimely filing, the Government's untimely filing led to automatic dismissal of the case and that the "Appellants have been acquitted by three [pretrial scheduling] Orders" of the court. To the contrary, the brothers filed motions to dismiss the case on the grounds that the

Government failed to comply with the amended pretrial order, and the court denied those motions.[64]

The district court did not dismiss the case.

IX

The brothers, in their pro se appeal, fail to raise the multiplicity argument and have therefore abandoned it.[65] In light of our multiplicity finding for Antoon's sentence, this is an unfortunate result but one that we must abide by.

We therefore AFFIRM in part and REVERSE in part, remanding to the district court for resentencing in light of this opinion.

---

[64] Minute Order, Motion Hearing and Pretrial Conference (Apr. 5, 2005).

[65] See Neeley v. Bankers Trust Co., 757 F.2d 621, 630 (5th Cir. 1985)). The Ogba brothers make no mention of any pre-trial motion regarding multiplicity in their brief, nor do they adopt any of Antoon's arguments.