# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 2, 2013

No. 12-20095

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

CAROLINE NJOKU; MARY ELLIS; TERRIE PORTER; EZINNE UBANI,

Defendants-Appellants

Appeals from the United States District Court
for the Southern District of Texas

Before DENNIS, CLEMENT, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

The defendants were convicted on numerous counts related to their involvement in schemes to commit health care fraud, receive or pay healthcare kickbacks, and/or make false statements for use in determining rights for benefit and payment by Medicare. Caroline Njoku, Terrie Porter, and Mary Ellis appeal their convictions on grounds of insufficient evidence. Njoku also argues the sentences she received on two counts were multiplicitous and the oral pronouncement of her sentence conflicts with the written judgment. Ellis contends that she was twice put in jeopardy because of a previous acquittal and that collateral estoppel bars the relitigation of certain issues. Ellis further brings an evidentiary challenge involving rules of hearsay and relevancy, as well

No. 12-20095

her right to present a defense. Ellis also argues her sentence resulted from an improper enhancement. Ezinne Ubani appeals her sentence based on the application of two enhancement provisions.

We REMAND for the district court to amend Njoku's written judgment to conform to her oral sentence. We AFFIRM in all other respects.

## BACKGROUND

On October 7, 2010, Njoku, Porter, Ellis, Ubani, and other co-defendants who are not parties in this appeal were indicted in the United States District Court for the Southern District of Texas. Njoku, Ellis, and Ubani were each charged with one count of conspiracy to commit health care fraud under 18 U.S.C. § 1349. Njoku, Porter, and Ellis were each charged with one count of conspiracy to receive or pay health care kickbacks under 18 U.S.C. § 371. Njoku and Porter were charged on one count and Ellis on three counts of receipt or payment of kickbacks in violation of 42 U.S.C. § 1320a-7b(b) and 18 U.S.C. § 2. Ellis and Ubani were charged with two counts each of making false statements for use in determining rights for benefit and payment by Medicare under 42 U.S.C. § 1320a-7b(a)(2) and 18 U.S.C. § 2.

There was evidence that articles of incorporation were filed on November 1, 2004 for a company named Family Healthcare Group, Inc., which would do business in Houston, Texas. The document listed Clifford Ubani, Princewill Njoku, and Ezinne Ubani as directors.[1] The company submitted a Medicare

---

[1] Co-defendants Clifford Ubani and Princewill Njoku were the husbands of Defendants-Appellants Ezinne Ubani and Caroline Njoku. Clifford Ubani and Princewill Njoku are not appellants. References to "Ubani" and "Njoku" are to Defendants-Appellants Ezinne Ubani and Caroline Njoku, and at times their full names are used for clarity. Clifford Ubani and

No. 12-20095

provider application in May 2005, which was approved in early 2006. The document listed Clifford Ubani and Princewill Njoku as co-owners; Ezinne Ubani was listed as a director/officer.

An authorized Medicare provider may bill Medicare for covered services provided to eligible beneficiaries. Family Healthcare provided home health care to individuals by use of skilled nurses. To qualify for such services under Medicare regulations, the patient must be homebound, under a doctor's care, and require skilled nursing. A claims analyst who reviewed medical records for Medicare fraud testified that "homebound" meant that it was generally taxing for the patient to leave home. In the analyst's nine years of experience, the referral source for such care was the patient's primary care physician.

The analyst further explained that in order to initiate such care, a registered nurse ("RN") was required to meet with the patient and complete an Outcome Assessment Information Set ("OASIS"). The questionnaire helped identify the patient's ability to function in daily living and would be used in part to determine whether the patient was homebound. Information from the OASIS would be entered into a computer program, which would produce a "plan of care." The same nurse who completed the OASIS was required to sign the plan of care. The plan would then be submitted to the referring physician to certify and sign.

If approved by the physician, a period of care lasted 60 days for purposes of Medicare regulations. A licensed vocational nurse ("LVN") provided the skilled nursing in the patient's home. The law required LVNs to keep nursing notes to document their visits and prove the care given. Additionally, these

Princewill Njoku are referenced throughout this opinion using their first and last names.

3

notes could provide a log of medication and patient conditions for future use. Agent Harshaw, a special agent charged with the investigation of criminal violations of the health care fraud laws, testified that Medicare required the nursing notes be preserved for auditing purposes.

The analyst explained that such services were not intended to be continuous. Nurses would instruct the patient or a caregiver on how to provide the needed care without a nurse's assistance. If a patient continued to need skilled nursing after the initial period, recertification for 60 more days was available. During the last five days of the first period, an RN would be required to visit and reassess the patient. This recertification process required the completion of a second, condensed OASIS. Agent Harshaw testified that an RN would partly rely on the LVN's nursing notes to complete the recertification evaluation. Adelma Sevilla, an RN who worked for Family Healthcare, testified that she reviewed nursing notes during this process. Once the recertification OASIS was complete, a new plan of care would be prepared, signed by the RN, and submitted to a physician for signed approval. The physician's approval generally involved the physician personally visiting the patient.

Medicare would reimburse service providers in bifurcated installments. The first was a payment of 60 percent of the claim after the initial billing. Medicare did not necessarily receive a patient's OASIS or plan of care at that time but instead relied on the service provider's representation subject to future inspections via audit. The remaining portion of the claim was paid once a sufficient number of skilled nursing visits were made. The indictment stated that Family Healthcare was paid approximately $5.2 million for home health

No. 12-20095

care services between April 2006 and August 2009. We describe in more detail below each individual's role. For now, we provide a general overview.

Njoku and Ellis worked as LVNs who provided skilled nursing care to patients. Ellis also referred Medicare beneficiaries to Family Healthcare. Porter also referred Medicare beneficiaries. Ubani worked as an RN who completed OASIS questionnaires and signed plans of care. At times, Family Healthcare used specific physicians to certify the plans of care.

Evidence at trial showed that Family Healthcare billed Medicare for services to beneficiaries who were ineligible for home health care because they were either not homebound or not in need of skilled nursing. RNs would sign OASIS questionnaires both on initial assessments and during recertifications without visiting the patients. Skilled nursing services were allegedly inadequate and misrepresented in the documented nursing notes. At least one physician was paid to authorize plans of care despite not having examined the patients. Recruiters were paid kickbacks to refer Medicare beneficiaries in order to accumulate additional patients.

After an eleven day trial, the jury found Njoku, Ellis, and Ubani guilty of conspiracy to commit health care fraud in Count 1. Njoku, Porter, and Ellis were found guilty of conspiracy to receive or pay health care kickbacks in Count 2. The jury found Njoku not guilty of receipt or payment of health care kickbacks in Count 12. Porter was found guilty of receipt or payment of health care kickbacks in Count 17. Ellis was found guilty of receipt or payment of health care kickbacks in Counts 3, 4, and 5. Finally, the jury found Ellis and Ubani guilty of making false statements for use in determining rights for benefit and payment by Medicare in Counts 20 and 21.

5

No. 12-20095

The district court announced Njoku's sentence as 63 months on Count 1 and 60 months on Count 2, to run concurrently.[2]  Porter was sentenced to 24 months on Counts 2 and 17 to run concurrently.  The court sentenced Ellis to 63 months on Count 1 and 60 months on Counts 2, 3, 4, 5, 20, and 21 to run concurrently.  Ubani was sentenced to 97 months on Count 1 and 60 months on Counts 20 and 21 to run concurrently.  These defendants appealed.

## DISCUSSION

Njoku, Ellis, and Porter  challenge the sufficiency of the evidence on some of the counts.  Njoku, Ellis, and Ubani raise arguments as to their sentences.  Ellis raises a variety of other issues.  We address each issue in turn.

*A. Sufficiency of the Evidence*

We review the defendants' "preserved challenges to the sufficiency of the evidence de novo." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012).  We view both circumstantial and direct evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict." *Id.*  In doing so, we ask "whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotation marks omitted).

*1. Count 1 (Conspiracy to Commit Health Care Fraud)*

A conspiracy to commit health care fraud under 18 U.S.C. § 1347 requires that the fraud be the object of the conspiracy.  18 U.S.C. § 1349.  The

---

[2] The written judgment states that Njoku was sentenced to 63 months' imprisonment on both counts.  We address this issue below.

conspirators must "knowingly and willfully" execute a scheme "to defraud any healthcare benefit program" or "to obtain, [through false pretenses] any of the money or property owned by . . . any health care benefit program."  18 U.S.C. § 1347.  Conviction requires proof "that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *Grant*, 683 F.3d at 643.  Circumstantial evidence can prove knowledge and participation. *Id.*

In her motion for judgment of acquittal and on appeal, Njoku argues the evidence was insufficient to prove she knew of the unlawful purpose and joined the agreement willfully.  We find sufficiency from the following.

Adelma Sevilla testified that she worked for Family Healthcare as an RN. She admitted to falsifying forms submitted to Medicare and said that other people she worked with, including Njoku, participated.  Because Sevilla could not drive a vehicle, Njoku almost always drove her to patients' homes to perform assessments. Njoku was also present with Sevilla during those assessments and witnessed patients performing activities that belied their homebound status or need for skilled nursing.  One patient who walked around without assistance directly told Njoku that he could drive himself.  Sevilla confirmed that she falsified the OASIS for this patient and for others.  Njoku was hardly oblivious to the requirements.  She not only worked as an LVN for Family Healthcare but also had completed training on OASIS assessments and reporting.

Even though Sevilla at one point expressed concern that some patients were not homebound, Njoku responded that Sevilla should process the

admissions anyway. Princewill Njoku was also an RN. After he was indicted, Caroline Njoku asked Sevilla, another RN, to sign recertification assessments in Princewill Njoku's place. Despite not having visited any of the patients, Sevilla complied. It is reasonable to infer that Caroline Njoku knew Sevilla had not completed in-person assessments of these patients partly because Njoku usually drove Sevilla to each patient's home. There were also times when plans of care were returned from physicians without their approval, and Njoku instructed office clerks to send the forms to a Dr. Echols, who was later shown to be involved in the scheme.

The underlying scheme was to obtain money from Medicare by false pretenses. We conclude there was sufficient evidence of Njoku's knowledge of the agreement and her willful joining of it with the intent to further its purpose.

*2. Count 2 (Conspiracy to Receive or Pay Health Care Kickbacks)*

It is unlawful to conspire with another to commit an offense against the United States and do an act to effect the conspiracy's object. 18 U.S.C. § 371. The substantive offenses in this case were the knowing and willful receipt of a remuneration, namely, a kickback, in return for referring a patient for home healthcare, or payment of such remuneration in order to induce someone to make such a reference. *See* 42 U.S.C. § 1320a-7b(b). A conviction of conspiracy under Section 371 requires the Government to prove:

> (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.

*United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009).

No. 12-20095

"The government must prove the same degree of criminal intent as is necessary for proof of the underlying substantive offense." *United States v. Peterson*, 244 F.3d 385, 389 (5th Cir. 2001). Thus, in addition to proving an intent to further the unlawful objective, there must also be proof that the defendant acted willfully, that is, "with the specific intent to do something the law forbids." *United States v. Garcia*, 762 F.2d 1222, 1224 (5th Cir. 1985); *see also United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998).

### a. Caroline Njoku

Njoku argues the evidence was insufficient to prove she knew of the unlawful purpose and joined the agreement with the intent to further that objective.[3] She contends the evidence shows mere presence in a climate of unlawful activity. We disagree.

Sammie Wilson testified that she received payments through checks drawn on Family Healthcare's account in exchange for referring patients who were Medicare beneficiaries. Wilson explained that notations on the checks such as "for 4" meant the number of patients she referred. At times, she was paid $500 per patient. On at least one occasion, Princewill Njoku was in the driver's seat of a vehicle and his then-wife Caroline was a passenger. He reached across Caroline and gave a check to Wilson as payment for patients she had referred.

There also was evidence of a check dated November 10, 2008, made payable to Caroline Njoku and drawn on Family Healthcare's account in the amount of $2,500. The memo line showed "5 from Sammie Wilson." There was

---

[3] In her argument on appeal, Njoku also relies on the fact jurors found her not guilty on Count 12 – a charge for a substantive offense under 42 U.S.C. § 1320a-7b(b) – and that such acquittal supports the inadequacy of the evidence on Count 2. Not so, as our "review is to be independent of the jury's determination that evidence on another count was insufficient." *United States v. Montalvo*, 820 F.2d 686, 690 (5th Cir. 1987) (quotation marks omitted).

No. 12-20095

a computerized notation on the check revealing it had been cashed. Njoku does not deny receiving the check and, in fact, attempted through cross examination to show that the check was her part of that month's payroll. Testimony from Ana Quinteros, a certified nursing assistant who worked for Family Healthcare, showed that some recruiters were paid in cash and were also paid through other people. Wilson did testify that she never received cash payments.

Regardless, Wilson's denial of cash payments would not mean the evidence was insufficient for the jury to find Njoku guilty of conspiracy. We must draw all reasonable inferences in favor of the jury's verdict. *Grant*, 683 F.3d at 642. Wilson's testimony revealed that she and Njoku had a uniquely close relationship, more than a typical nurse-patient friendship. Wilson actively worked as a recruiter for Family Healthcare, and it is reasonable to infer that Njoku knew Wilson was being paid for those referrals as part of the underlying scheme. Further, Njoku's activities, including her involvement with what one could infer was a payment to Wilson, are sufficient to prove Njoku willfully joined in the agreement to pay recruiters for referrals.

### b. Terrie Porter

Porter, who was one of the alleged recruiters for Family Healthcare, argues the evidence was insufficient to prove she knew about an unlawful objective or joined the agreement with the intent to further that objective. Porter contends she referred patients to Family Healthcare because she believed they needed and would receive home health care. Porter states she had no agreement to recruit only Medicare beneficiaries.

Between 2006 and 2009, Porter worked at the University of Texas Health Science Center in the Department of Physical Medicine and Rehabilitation. She

No. 12-20095

assisted physicians in administrative responsibilities. Her resume revealed that she worked with confidential patient information. Porter testified, though, that the only patient billing she handled was for compensation claims for work-related injuries and not claims involving Medicare. She explicitly denied having access to patients' Medicare information.

Porter testified that her friend believed a nearby agency (Family Healthcare) was looking for community liaisons. She was put in touch with Clifford Ubani and eventually interviewed with him and Princewill Njoku in a vehicle outside of her place of employment. She wondered whether the two men were involved in a fraud. Porter later admitted at trial that Family Healthcare began paying her for referring patients. Agents eventually discovered a log of Porter's referrals on the computer hard drives at Family Healthcare. Although Porter argues she was not listed as the referral source for corresponding patients on other documents, the jury heard testimony from Agent Harshaw that it was permissible to have more than one referral source per patient.

Porter's main defense was that she did not know about the Family Healthcare's schemes or the illegality of the referral payments. She denied having an agreement with Clifford Ubani to receive payments only for Medicare-beneficiary referrals. Porter alleged he paid her for anyone she referred.

There was testimony that Memorial Hermann Hospital was a teaching institution for the University of Texas in Houston. Hermann Hospital provided patient information to the University for billing purposes. Dr. Stephen Yang testified about Porter's access to patients' confidential information due to her employment at the University. Dr. Yang worked at the University between 2006 and 2010 as an assistant professor in the same department as Porter. He also

11

treated patients at the Hospital. Dr. Yang explained that he handled patients' medical charts during his day-to-day practice. Those charts included what the Hospital called "face sheets." The sheets contained information about patients' insurance providers such as Medicare. Dr. Yang stated that he was required to report charges that he billed and would attach that billing data to the face sheet. He then placed the documents in a basket for processing. Dr. Yang knew Porter from their working at the University. Her desk as an administrative assistant was down the hall from where he placed documents in the basket. He also knew that Porter processed patients' billing information because he had witnessed her speaking with a billing company.

A legal privacy officer who worked for the University testified regarding Porter's employment records. The officer reviewed documents in Porter's employment file, which revealed one of Porter's responsibilities was to maintain all medical billing and routine office duties. Porter had received advanced training on patients' rights regarding the confidentiality of their health care information.

We disagree with Porter that the evidence was insufficient to support a finding of guilt. Porter initially suspected Clifford Ubani and Princewill Njoku of fraudulent activity. She still agreed to work for them and admitted to referring patients to Family Healthcare and receiving payments in exchange. Porter defended her actions based on her belief that they were legitimate referrals, but the jury also heard her testify that she received payments for patients' recertifications despite having provided no additional work in exchange. Agent Harshaw testified that the patients on a referral list associated with Porter were Medicare beneficiaries. According to his testimony, more than

No. 12-20095

three-quarters of those beneficiaries were also patients at the Memorial Hermann Hospital. This circumstantial evidence, along with the testimony that she had direct access to patients' Medicare information and advanced training in confidentiality regulations, was sufficient to prove that Porter knew of the unlawful objective of recruiting Medicare beneficiaries and willfully joined the agreement with the intent to further that objective.

*3. Counts 20 and 21 (False Statements for Use in Determining Rights)*

It is unlawful to "knowingly and willfully make[] . . . any false statement or representation of a material fact for use in determining rights to [any benefit or payment under a Federal health care program]." 42 U.S.C. § 1320a-7b(a)(2). The jury charge instructed that a false statement is material if it has a natural tendency to influence or is capable of influencing the recipient.

The indictment alleged that Ellis described non-existent symptoms and services that were not performed for two patients. On appeal, Ellis concedes the evidence showed her nursing notes contained false statements. She argues that they were not material because they could not be used to determine either patient's right to home health care. Ellis relies on a claims analyst's testimony that an RN completes the OASIS questionnaire, and the RN and physician approve the resulting plans of care. Further, Medicare would not authorize payment if these forms merely were signed by an LVN such as Ellis.

Ellis also acknowledges the testimony that an LVN was legally required to keep nursing notes that documented patient care. We conclude these notes were material in support of her conviction. The claims analyst explained at trial that Medicare required the preservation of nursing notes in the event of an audit. Ellis herself testified that Family Healthcare encountered two audits

while she worked with the company. In addition, Agent Harshaw testified that an RN partly relies on an LVN's nursing notes when completing the recertification OASIS. The claims analyst testified that an RN partly would rely on nursing notes to determine future treatment.

Regarding the two patients listed in the indictment for Counts 20 and 21, Ellis allegedly provided services for them as their LVN. Both patients were recertified for a second period of home health care. An RN was associated with each recertification. Family Healthcare billed Medicare for both patients. Under either circumstance, Ellis's false statements on her nursing notes were material and capable of influence for purposes of determining rights to payment by Medicare. The evidence was sufficient to sustain Ellis's conviction.

*B. Multiplicity*

Njoku argues her two conspiracy convictions in Counts 1 and 2 are multiplicitous. Before trial, Njoku failed to object to her indictment as multiplicitous. *See* FED. R. CRIM. P. 12(b)(3). Such a claim cannot now be raised on appeal. *United States v. Dixon*, 273 F.3d 636, 642 (5th Cir. 2001). Thus, the convictions on each count stand.

A challenge to sentences as being the result of multiplicitous indictments can be considered even if only presented on appeal. *Id.* Because Njoku failed to object in the district court, we review only for plain error. *United States v. Ogba*, 526 F.3d 214, 232 (5th Cir. 2008). This requires a showing of "(1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* at 236. If shown, we have discretion to correct the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 236-37.

We interpret Njoku's argument to rest on the claim that although she was charged with violating two different statutes, one of the violations could be the lesser included offense of the other. In this circumstance, we consider whether "each offense requires proof of an element that the other does not . . . ." *United States v. Woerner*, 709 F.3d 527, 539 (5th Cir. 2013) (citing *Blockburger v. United States*, 284 U.S. 299, 303-05 (1932).

Njoku relies on a decision in which we reviewed whether there was multiplicity in charges for the substantive crimes of health care fraud under 18 U.S.C. § 1347 and illegal remunerations under 42 U.S.C. § 1320a-7b(b). *Ogba*, 526 F.3d at 233-34. The court initially distinguished the crimes:

> [T]he statutes each require proof of an additional fact that the other does not. Illegal remuneration does not require fraud or falsity; a defendant could be honest about accepting illegal remunerations. Health care fraud, on the other hand, requires fraud or falsity but does not require payment in return for a referral.

*Id.* at 234. The court then stated that if a defendant's "healthcare fraud conviction were based entirely on proof of his receipt of kickbacks, which he did dishonestly, then a conviction for illegal remuneration is a lesser included offense of healthcare fraud . . . ." *Id.* The *Ogba* jury charge included various theories of health care fraud, and the indictment alleged alternative methods by which the scheme was committed. *Id.* at 235. One of those means included paying or receiving remunerations in exchange for referrals, *i.e.*, kickbacks. *Id.* The court explained the jury could have based its finding of guilt on health care fraud solely on the theory of illegal remunerations. *Id.* at 236. Accordingly, the court concluded that the sentence violated the Double Jeopardy Clause. *Id.*

No. 12-20095

The present case is distinguishable. The two convictions involve two conspiracies, one under 18 U.S.C. § 1349 and the other under 18 U.S.C. § 371. One statute requires that the government prove an additional fact that the other does not. Section 1349 requires proof of a conspiracy to commit an offense of fraud and that such fraud is the object of the conspiracy. Section 371 prohibits two or more persons from conspiring to commit any offense against the United States. Further, Section 371 requires proof of an overt act, which Section 1349 does not. *Grant*, 683 F.3d at 643; *Mauskar*, 557 F.3d at 229.

As the court did in *Ogba*, we also examine the jury charge. To find Njoku guilty of the conspiracy to commit health care fraud in Count 1, the jury was required to find the following beyond a reasonable doubt:

*First*: That two or more persons made an agreement to commit the crime of health care fraud as charged in the Indictment;

*Second*: That the defendant knew the unlawful purpose of the agreement; and

*Third*: That the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose.

The indictment described the unlawful purpose in Count 1 as including the receipt of kickbacks *in addition to* the submission of fraudulent claims to Medicare. The charge of conspiracy to receive or pay health care kickbacks in Count 2 required the jury to find that the defendant "knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose." The indictment described the unlawful purpose in Count 2 as receiving or paying kickbacks "in exchange for providing Medicare beneficiary

16

No. 12-20095

information that was used to submit claims to Medicare." Unlike in Count 1, the submitted claims did not need to be fraudulent.

In order for the jury to find Njoku guilty of the charge in Count 2, it had to find "[t]hat one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the Indictment . . . ." The indictment listed specific acts: (a) the payment of a referral check from Clifford Ubani to Ellis, (b) the payment of a referral check from Princewill Njoku to Sammie Wilson, and (c) the payment of a referral check from Clifford Ubani to another recruiter. In contrast, the conspiracy for Count 1 listed acts that the conspirators intended, but there was no requirement that those acts have actually occurred.

Njoku has not shown plain error as to her multiplicity claim.

## C. Double Jeopardy

### 1. Count 1

Ellis contends that her conspiracy conviction under Count 1 violates the Double Jeopardy Clause of the Fifth Amendment because she was acquitted of conspiracy in a previous prosecution. In October 2009, Ellis was indicted on one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. The indictment identified Ellis as an LVN who worked for Family Healthcare and recruited Medicare beneficiaries for the purpose of filing claims with Medicare for durable medical equipment ("DME") that was medically unnecessary or not provided. The indictment further alleged that Ellis received kickbacks for the referrals. After a trial by jury, Ellis was found not guilty.

17

No. 12-20095

In October 2010, Ellis was charged in the present case with conspiracy under the same statute. The indictment here alleged that Ellis worked for Family Healthcare as an LVN who provided nursing services to patients and referred Medicare beneficiaries, in exchange for kickbacks, for the purpose of filing fraudulent claims with Medicare for skilled nursing services that were medically unnecessary or not provided. This time she was found guilty.

We review the double jeopardy claim *de novo*. *United States v. El-Mezain*, 664 F.3d 467, 546 (5th Cir. 2011). The Fifth Amendment "protects against a second prosecution for the same offense after acquittal." *United States v. Levy*, 803 F.2d 1390, 1393 (5th Cir. 1986) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). The issue for us "is whether there was one agreement and one conspiracy or more than one agreement and more than one conspiracy." *El-Mezain*, 664 F.3d at 546.

First, Ellis must establish "a prima facie nonfrivolous double jeopardy claim." *United States v. Rabhan*, 628 F.3d 200, 204 (5th Cir. 2010). Ellis has done so by the introduction of her indictment in the DME case along with additional material in the record. *Id.* A nonfrivolous claim creates for the Government the burden to prove "by a preponderance of the evidence that the defendant has been charged in separate conspiracies." *Id.*

We are guided by five factors, none of which is determinative:

> 1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offense charged that indicates the nature and scope of the activity that the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place.

18

*El-Mezain*, 664 F.3d at 546.  Our review will explain why there were two agreements and two conspiracies.

### a. Time

An overlapping time period supports a finding that there was only one conspiracy, particularly if that period is lengthy.  *Rabhan*, 628 F.3d at 205. Here, the skilled nursing conspiracy allegedly began in April 2006 and lasted through August 2009.  The DME conspiracy allegedly began in August 2007 and ended at some point between June and October 2009.  This overlap is sufficient under *Rabhan* and supports that only one conspiracy existed.  *Id.*

### b. Co-conspirators

"An overlap in personnel participating in the conspiracy, particularly in key personnel, indicates a single conspiracy."  *Id.*  When those key figures "serve different functions for purposes of the conspiracies, it is less likely that there is a single agreement."  *El-Mezain*, 664 F.3d at 547.

Ellis alleges an overlap in two key personnel: Clifford Ubani and Princewill Njoku.  Ellis argues these men were the owners of Family Healthcare and orchestrated both the DME and skilled nursing schemes.

The DME indictment identified both men as owners and operators of Family Healthcare, and the indictment further revealed that Princewill Njoku was an RN.  They allegedly maintained a valid Medicare provider number to submit claims for the cost of DME, controlled the day-to-day operations, paid kickbacks to recruiters, obtained prescriptions, submitted claims, and caused the transfer of fraudulent proceeds.

The skilled nursing indictment identified both men as owners and operators of Family Healthcare.  It detailed that Clifford Ubani was the

company's chief financial officer, and Princewill Njoku was an RN who purportedly provided home health care services to referred beneficiaries. Clifford Ubani's role was paying kickbacks for referrals and submitting fraudulent claims. Princewill Njoku's role was more involved, including falsifying patient files to make it appear beneficiaries received skilled nursing care services that were not provided, approving plans of care that were not medically necessary, and providing recertifications despite knowing the services were not necessary.

Clifford Ubani testified at the DME trial that his main concentration was on DME and he had little involvement in the skilled nursing scheme. He had attempted to start a DME business before he got involved with Family Healthcare. Clifford Ubani explained that, as the chief financial officer, he signed checks when they were given to him. There was evidence suggesting that Princewill Njoku, the RN, took the leading role in the skilled nursing scheme.

The bifurcation of responsibilities is also revealed by Princewill Njoku becoming the owner of Family Healthcare in December 2008. Clifford Ubani began a new company named Family DME, Incorporated, which used a different Medicare provider number. Clifford Ubani testified that these events signified an end to the joint venture. "I was on my own. He was on his own, too. The old [company] was abandoned." Evidence also showed that the companies' records were separate and that each used separate bank accounts.

Somewhat offsetting those facts, there was testimony showing the money in the accounts occasionally was commingled. Both men shared some responsibilities. The absence of complete consistency in the separation, though, does not effectively rejoin the two schemes. Further, Clifford Ubani and

20

No. 12-20095

Princewill Njoku had different roles in each scheme. Adelma Sevilla testified that both men interviewed her for employment, but she viewed Clifford Ubani as a financial advisor and Princewill Njoku as the director of nursing. That the two men served different functions in each scheme supports the finding that two conspiracies existed. *El-Mezain*, 664 F.3d at 547.

Ellis insists there was an overlap in six less-central conspirators, namely four recruiters (including herself) and two physicians. Testimony showed that the four recruiters referred beneficiaries for both DME and home health care. The two physicians certified prescriptions for both DME and home health care.[4] It is relevant, though, that other co-conspirators, such as Caroline Njoku and Ezinne Ubani, actively participated in the skilled nursing scheme but had no apparent role in the DME scheme. The DME case involved fewer participants and a more limited plan that included recruiting Medicare beneficiaries, providing equipment, and submitting claims. The skilled nursing case engaged Princewill Njoku in a different function as an RN and required the additional work of medically trained nurses, including Caroline Njoku and Ezinne Ubani, providing various degrees of services and representations. Although *some* characters were interwoven into both schemes, such overlap in this context does not convincingly support a contrary finding that a single conspiracy existed. *See id.*

### c. Statutory Offenses

Ellis was charged in both prosecutions with conspiracy under 18 U.S.C. § 1349 to commit health care fraud through a violation of 18 U.S.C. § 1347.

---

[4] Clifford Ubani testified in the DME trial that 70 to 80 percent of prescriptions for DME were signed by another physician, Dr. Hutchens.

No. 12-20095

Thus, there were not additional offenses charged in the skilled nursing prosecution, which undermines the argument that two conspiracies existed. *See Rabhan*, 628 F.3d at 207; *Levy*, 803 F.2d at 1395.

### d. Nature and Scope of the Activity

There is some overlap in the description of the offenses charged in each indictment. Both indictments alleged that claims were submitted to Medicare for either equipment or services that were unnecessary or not provided to patients. The patients were recruited through referral sources, and these sources received remunerations in exchange for supplying the beneficiaries.

We are convinced, though, that the Government sought to punish different activities in the skilled nursing case and in the DME case. The skilled nursing indictment alleged additional manners and means through which the conspiracy was accomplished. For example, as an LVN, Ellis allegedly falsified patient files to make it appear Medicare beneficiaries qualified for services; Princewill Njoku and Ezinne Ubani, who were RNs, allegedly falsified OASIS questionnaires to ensure the beneficiaries qualified; the indictment also alleged they approved recertifications and plans of care that were not medically necessary.

There was evidence in both trials of similar activities, including evidence of Ellis's knowledge that the paid referrals were illegal, her employment history, and kickback checks. Evidence also shows that some patients may have been recruited for and received both DME and home health care services. The possible overlap, though, involves only a portion of the activity involved in both the DME and the skilled nursing cases.

We must "review the entire record and take a commonsense approach in determining the substance of each alleged conspiracy." *Levy*, 803 F.2d at 1395.

22

No. 12-20095

The DME indictment focused on Ellis's activity as a recruiter. The kickback checks she received for the DME beneficiary referrals made up the central evidence presented against her at trial; these checks were not admitted into evidence in the skilled nursing trial. The skilled nursing trial involved evidence regarding Ellis's false nursing notes for home health care services, which were not part of the DME trial.[5] *Cf. id.* False medical certifications were inescapably part of the conjunctively listed purposes in the skilled nursing indictment. For the jury to find Ellis guilty of the charge in Count 1, it was required to find that Ellis knew of this unlawful purpose and joined *this* agreement with the intent to further that purpose. We find this activity was of a different nature and scope than the referrals. Accordingly, this factor weighs in favor of finding two conspiracies existed.

### e. Places

The Government conceded in its response in opposition to Ellis's motion to dismiss the indictment that the location of the acts weigh in favor of finding a single conspiracy. Additionally, the evidence shows that the two schemes were conducted out of a single office in Houston and later separated by only three

---

[5] Clifford Ubani testified at the DME trial that there were prescription forms with check boxes that Family Healthcare's employees generated for physicians to sign. Ana Quinteros testified at the DME trial that recruiters would also measure patients to determine the appropriate size of the equipment. Her testimony revealed, though, that the forms were pre-written only for the doctors that Family Healthcare paid for their signatures. The forms did not require the signature of a medically licensed nurse. Ellis testified that she had never filled out such a form. In contrast, the nursing notes involved in the skilled nursing case required documentation of patient conditions observed and treated by a medically licensed nurse, whose representations were subsequently used to determine a patient's need for additional episodes of care and preserved in addition the physician's prescription for home health care.

office suites.  This factor weighs in favor of finding one conspiracy existed. *Rabhan*, 628 F.3d at 208.

In conclusion, the time, statutory offenses, and places involved suggest that there was one agreement.  Nevertheless, we hold that two agreements and two conspiracies existed because of the separate functions that central co-conspirators provided in each scheme and the distinctive activity that the Government sought to punish in each case.  *See El-Mezain*, 664 F.3d at 551.  We reject Ellis's argument that the Double Jeopardy Clause was violated.

*2. Counts 2-5*

Ellis next argues that when she was acquitted of conspiracy in the DME trial, the jury necessarily determined that she did not know her paid referrals were illegal.  The Government in the current prosecution had to prove she acted willfully (as well as knowingly) to convict her on Counts 2 through 5.  Count 2 charged Ellis with conspiracy under 18 U.S.C. § 371 for willfully receiving remuneration in exchange for referring beneficiaries, in violation of 42 U.S.C. § 1320a-7b(b)(1).  Counts 3 through 5 charged Ellis with willfully receiving those remunerations in violation of Section 1320a-7b(b)(1).  The jury instructions defined the word "willfully" to mean "with the intent to do something the law forbids; that is with the bad purpose to disobey or disregard the law."  Thus, Ellis argues that if the jury in the DME trial necessarily determined that she did not intend to do an act the law forbids, the Fifth Amendment prohibits the Government from prosecuting on Counts 2 through 5 in the present case.  We review Ellis's argument *de novo*.  *El-Mezain*, 664 F.3d at 551.

In a criminal case, the Double Jeopardy Clause will "bar a subsequent prosecution if one of the facts necessarily determined in the former trial is an

essential element of the subsequent prosecution." *United States v. Sarabia*, 661 F.3d 225, 229 (5th Cir. 2011). Ellis has the burden to demonstrate that whether she knew her conduct was unlawful was a fact that the jury necessarily had to decide in finding her not guilty. *See id.* at 229-30. We review the record of the prior trial to determine "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.* at 230.

The indictment in the DME case charged Ellis with conspiracy to commit health care fraud under 18 U.S.C. § 1349. The jury was instructed that in order to find Ellis guilty, there must have been: (1) an agreement to commit health care fraud; (2) Ellis knew of the unlawful purpose of that agreement; (3) joined in it willfully; (4) with the intent to further that purpose. The indictment explained that the purpose of the conspiracy was the unlawful enrichment of the participants by submitting and concealing false claims to Medicare, receiving the proceeds, and diverting them for personal use. The jury instructions further defined "willfully" to mean "with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." We accept for the sake of argument that the evidence in the DME case conclusively established an agreement existed. We focus on Ellis's contention that the jury necessarily determined she did not know her conduct was unlawful.

At the DME trial, the Government presented evidence that Ellis cashed checks from Family Healthcare which referenced durable medical equipment, specifically arthritis kits. An FBI agent testified that Ellis admitted she knew her paid referrals were unlawful. In her own defense, Ellis testified that Clifford Ubani and Princewill Njoku described these payments as bonuses and part of an

incentive program. She stated that Clifford Ubani called a meeting and informed the employees that the company would begin offering arthritis kits to patients. Ellis further testified that she did not know that Family Healthcare was engaged in illegal conduct with regard to the arthritis kits and never filled out a prescription form for DME. Clifford Ubani testified that Ellis was a bona fide employee who was paid a salary for her skilled nursing services. He also said that he never discussed with Ellis that it was illegal for her to be paid in exchange for making referrals, and he did not explain to her how Family Healthcare generated income. At closing arguments, Ellis's counsel pointed out to the jury that the evidence revealed no document that contained Ellis's handwriting or signature. The jury found Ellis not guilty.

According to the record, there were two forms of intent that had to be proven in the DME trial: (1) intent to do something the law forbids and (2) intent to further the unlawful purpose of the conspiracy, which included the submission and concealment of false claims to Medicare. Jurors could have believed the testimony showing she did not know her paid referrals were illegal. The jury could have also found she knew her paid referrals were unlawful but believed she did not know about the fraudulent claims submitted for DME or that she did not intend to further the unlawful purpose as charged in the indictment. Because our inquiry is to determine what the jury "*must* have decided," Ellis has failed to show she was twice put in jeopardy because of this subsequent prosecution. *Id.* at 232.

## D. Former Testimony

Ellis argues the district court erred in excluding portions of Clifford Ubani's former testimony. Although Clifford Ubani testified in the DME trial,

in the present case the court sustained his invocation of the right against self-incrimination. On the seventh day of trial, the district court asked for a definite list of which parts of the DME transcript Ellis sought to admit. Ellis provided line numbers from the transcript that totaled 22 pages of testimony. After hearing the parties arguments and reviewing the excerpts, the district court ruled against the admission of the evidence because it did not meet an exception to the rule against the admission of hearsay. FED. R. EVID. 802. Alternatively, the court determined that the probative value of the testimony was weak and that the dangers of confusing the issues and wasting time substantially outweighed that probative value. FED. R. EVID. 403.

We review the district court's decision to exclude the evidence for an abuse of discretion. *See United States v. Saldana*, 427 F.3d 298, 306 (5th Cir. 2005). We do not decide whether the former testimony was admissible under the rules of hearsay because Ellis fails to show that the district court abused its discretion in alternatively excluding the evidence on relevancy grounds. *See id.* at 307.

The first selected portions of Clifford Ubani's testimony revealed general information about Family Healthcare and his position there. Next, Clifford Ubani explained that Ellis was employed as a skilled nurse and that at the time Ellis was hired, on July 7, 2006, Family Healthcare was not yet engaged in distributing DME. Clifford Ubani said that on the date Ellis was hired, he did not explain to her how the company generated income, did not believe the company's actions were illegal, and did not have a conversation with Ellis about the legality of Family Healthcare's operations. He testified that the company used two different checking accounts to split the money involved in skilled nursing and DME. After counsel inquired about a check written to Ellis for

No. 12-20095

"marketing material," Clifford Ubani revealed that money was occasionally commingled between the accounts. He stated that the marketing efforts were legal. When counsel asked whether Ellis ever agreed with him to do something illegal, Clifford Ubani said "No." Finally, he testified that Ellis was paid bonuses before the company opened the DME company.

On appeal, Ellis alleges the central issue in her trial was whether she willfully agreed to a scheme to defraud Medicare. In her argument for admissibility under the residual hearsay exception, Federal Rule of Evidence 807, Ellis contends the probative value of Clifford Ubani's statement that he never agreed with Ellis to do something unlawful was high. Ellis's extensive experience in nursing and the FBI agent's testimony supported a finding that she knew her paid referrals were unlawful. Ellis's testimony, on the other hand, denied any knowledge. Thus, supportive testimony from Clifford Ubani would have had some probative value, particularly for the time period after Ellis began working for Family Healthcare in 2006 and before DME sales began in 2007. But this is only part of the relevance inquiry.

Ellis contends that there was nothing misleading about Clifford Ubani's testimony that he had not discussed unlawful activity with Ellis. In the first part of the selected testimony, counsel asked Clifford Ubani whether he had a conversation with Ellis on July 7, 2006 about engaging in illegal activity. He said, "No." What is missing from Ellis's selected portion of the evidence is Clifford Ubani's testimony that he did not usually hire nurses by himself and that he knew Ellis had been hired because Princewill Njoku told him about it. Counsel repeatedly focused on the specific date Ellis was hired in eliciting Clifford Ubani's response, despite the other evidence, which Ellis did not

28

ultimately select for admission, showing Clifford Ubani may not have personally hired Ellis.

The second reference in Clifford Ubani's testimony to the absence of an unlawful agreement appears later in the transcript. Clifford Ubani's testimony had shown that Ellis was hired at Family Healthcare in 2006. Counsel then turned the questioning to the time period in 2007 when the company began distributing DME. Counsel asked whether the same account used to pay employees in 2006 was used to pay through 2008. Clifford Ubani explained that two separate checking accounts existed, one for skilled nursing and one for DME. He later clarified that, if necessary, the money would be commingled. Immediately after discussing the subject of a check for "marketing material," counsel said, "So, when, in your mind, was there an agreement made with Mary Ellis? Did y'all discuss, saying 'We're going to do something illegal. This is wrong, but we're going to do it anyway?' Did she ever agree with you to do something illegal?" Clifford Ubani responded, "No."

The potentially confusing aspect of this excerpt is the ambiguity as to what activity the statement refers. Thus, the elicited affirmance that Clifford Ubani did not "ever" have an agreement with Ellis may be taken out of context if the testimony discussed referrals for DME, which were outside the scope of the present indictment.

Accordingly, the district court's concern was reasonable that the admission of this selected testimony would require additional evidence and risk having the jury decide an essential element on an impermissible basis. There was in fact some parts of the prior testimony that were misleading or confusing. We will not disturb the district court's discretionary ruling.

No. 12-20095

*E. The Right to Present a Complete Defense*

Ellis argues that the district court's exclusion of Clifford Ubani's former testimony violated her constitutional right to present a complete defense. This court reviews Sixth Amendment claims *de novo*, and evidentiary rulings for abuse of discretion. *United States v. Templeton*, 624 F.3d 215, 223 (5th Cir. 2010).

The Sixth Amendment right to present a complete defense may be violated by "evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotation marks omitted). Even so, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326. Because one of the reasons the district court excluded the former testimony was that its probative value was substantially outweighed by the potential to mislead, we reject the contention that any constitutional rights were violated. *See United States v. Eff*, 524 F.3d 712, 720 (5th Cir. 2008).

*F. Sentencing*

*1. Mary Ellis*

Ellis contends the district court erred in calculating her offense level at sentencing. In considering her argument, "we review the district court's factual findings for clear error and its interpretation of the Guidelines *de novo*." *Mauskar*, 557 F.3d at 232.

At sentencing, the district court applied an enhancement under U.S.S.G. § 2B1.1(b)(1)(H) (2011) based on an attributable loss of more than $400,000.

Ellis objected.  She argues on appeal that the evidence did not support a finding that she subjectively intended to cause such a loss and that the loss was not based on her conduct.

Commentary to Section 2B1.1 states that the "loss is the greater of actual loss or intended loss."  § 2B1.1 cmt. n.3(A).  Given the arguments at sentencing and the court's stated determinations, we examine the "actual loss," which is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i).  Actual loss requires a causal connection in fact, that is, a finding that Ellis truly caused the loss. *See United States v. Olis*, 429 F.3d 540, 545-46 (5th Cir. 2005).  The district court "need only make a reasonable estimate of the loss."  § 2B1.1 cmt. n.3(C).  The court "is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range." *Mauskar*, 557 F.3d at 234.

The district court estimated that the loss attributable to Ellis was $401,000.  At sentencing, the Government initially contended the loss was $1,025,899.87 and presented an exhibit which listed beneficiaries for whom Ellis had prepared at least one nursing note and the amount billed to Medicare for each patient.  Ellis objected, arguing that she did not know at least 12 of the patients on the exhibit.  She also contended the total was $131,000 based on the patients she admitted to referring, which would have resulted in a reduced enhancement. *See* § 2B1.1(b)(1).  The court was persuaded that the Government could prove at least $400,000 in loss because the evidence showed that Ellis provided skilled nursing services in addition to the referrals of patients who did not need those services and were recruited instead of referred by physicians. Additionally, the Government directed the court to Trial Exhibit 47, which was

No. 12-20095

a summary exhibit of Ellis's patients and their respective recertifications, Medicare claim amounts, and certifying physicians. The total of these claims was $760,551.66. Agent Harshaw testified that a person under his direction created Trial Exhibit 47 based on claims data, referrals sheets located on the computer, and the filed face sheets. Agent Harshaw also stated that he created a related exhibit which was admitted and revealed the same amount based on the claims data he personally reviewed during his investigation.

Ellis presented exhibits to show contradictions in the initial summary exhibit the Government presented. She also presented a list of 26 patients who Adelma Sevilla believed were not homebound. Finally, Ellis narrowed the Government's list of patients and claims down to those associated with Dr. Echols, who arguably was more clearly involved in the fraud. The district court considered the evidence and ultimately assessed the loss at $401,000. The court found the Government's records more reliable than Ellis's recollection and based its decision on the presented exhibits, including Ellis's referral list, patient list, and logs of patient care admitted at trial.

On appeal, Ellis argues the district court did not consider evidence that contradicted the Government's evidence that Ellis was a referral source for all of the patients in the first sentencing exhibit. At trial, though, Agent Harshaw testified that there could be more than one referral source based on his review of the evidence. Ellis next argues that she did not recall at least twelve of the patients on the Government's exhibit, but she has not shown clear error in the district court's explicit credibility finding. Third, Ellis contends that some patients had prescriptions for home health care, but Agent Harshaw testified that out of the hundreds of patient files he reviewed, only three or four had

32

prescriptions.    Thus, this contention does not sufficiently alter the loss calculation for us to determine there was clear error in the factual findings.

Further, Ellis contends that some patients were not homebound and that the court did not distinguish between legitimate nursing visits and illegitimate ones.    She also argues her skilled nursing services were provided after beneficiaries had received plans of care, which means Medicare would have already paid a percentage of the claims under the bifurcated payment system. As the district court reasoned, though, a central idea of this scheme was to generate sources of income:  Medicare beneficiaries.  The claims analyst, who had also worked as a nurse, testified at trial that a physician's prescription was required before home health care could be initiated.  Although evaluations could be conducted before that prescription was written, that was not the general practice according to her experience.  In fact, almost all referrals came from treating physicians.  Here, Agent Harshaw's testimony provided evidence that only three or four patients had prescriptions.

Ellis's skilled nursing services were also important to the scheme. Evidence shows that Ubani was the RN for many patients for whom Ellis was listed as the LVN.  Ana Quinteros testified at trial that Ellis did not provide all of the skilled nursing services she reported and that OASIS questionnaires were signed by Ubani without her having seen the patients.  In fact, the OASIS questionnaire would be blank, signed by the patient, and subsequently completed to obtain a physician's signature and permit the Medicare claim.

Thus, the inquiry does not turn on whether each patient ultimately was not homebound or in need of skilled nursing services because evidence proved that Ellis engaged in conspiracies to commit health care fraud and receive

33

No. 12-20095

kickbacks in exchange for referrals, which ultimately resulted in payments by Medicare. This conduct is prohibited. Her recruitment and nursing activities provided direct causal links to the claims and pecuniary harm as she referred patients who did not have prescriptions and falsified her nursing notes, which were used in the process of generating plans of care and subsequent recertifications. Ellis's position at Family Healthcare and relationships with co-workers and patients ensure that the losses she caused were reasonably foreseeable. The Government presented reliable evidence to prove it was more likely than not that Ellis was accountable for over $700,000 in Medicare claims related to the conspiracies. The district court took into consideration her contrary evidence but remained unpersuaded that she was accountable for less than $400,000. Ellis has not shown on appeal that the findings were clearly erroneous or that the court misapplied the law. Accordingly, her argument that her sentence should be vacated is rejected.

### 2. *Ezinne Ubani*

Ubani argues the district court erroneously calculated her offense level at sentencing. We review the court's factual findings for clear error and its interpretation of the Sentencing Guidelines *de novo*. *United States v. Miller*, 607 F.3d 144, 147 (5th Cir. 2010). Findings are upheld if they are "plausible in light of the record as a whole." *Id.* at 148.

Ubani objected to the application of two sentencing enhancements: one two-level increase for her role in the offense as a manger or supervisor and another two-level increase for an abuse of trust. At sentencing, the district court overruled both objections after hearing arguments and reviewing the evidence.

34

No. 12-20095

We first address Section 3B1.1(c), which provides for a two-level increase in the offense level if the defendant was a manager or supervisor. The district court relied on documentation showing Ubani held herself out as a person who coordinated and oversaw patient services and beneficiary assessments. The court also relied on evidence that showed Ubani assumed Princewill Njoku's administrative duties in his absence. Finally, the court acknowledged one witness's testimony that she reported to Ubani while working as a recruiter.

Ubani argues the evidence showed that she was an RN who merely worked under the direction of Clifford Ubani and Princecwill Njoku and evidence of any managerial role was insufficient. We disagree. Agent Harshaw testified that both the articles of incorporation for Family Healthcare and its Medicare provider application listed Ubani as a director/officer of the company. He also discovered her resume during the investigation, which stated that her job responsibilities at Family Healthcare included coordinating and overseeing all patient services provided by agency personnel. It also revealed that she assumed the duties of administrator in Princewill Njoku's absence. A form submitted to the Texas Department of Disability and Aging listed Ubani as Family Healthcare's director of nursing. Ubani suggests in her argument that the documentation reflected a period of time outside of the scope of the indictment, but Agent Harshaw's evidence shows otherwise, revealing a form dated November 20, 2007, which showed Ubani was still a delegated official to act on the company's behalf.

Further, the testimony of others who worked with Ubani supported the court's finding that Ubani took on a supervisory role. Even if we did find error, it would be harmless because the district court explicitly stated that it would

35

give the same sentence even if the enhancement did not apply. *United States v. Richardson*, 676 F.3d 491, 511-12 (5th Cir. 2012).

We next discuss Section 3B1.3, which provides for a two-level enhancement if Ubani abused a position of trust. This trust "refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." § 3B1.3 cmt. 1. Such individuals generally have less supervision than other employees. *Id.* The person's position "must have contributed in some significant way to facilitating the commission or concealment of the offense." *Id.* The district court determined that Medicare invests an important trust in RNs who complete OASIS questionnaires and certify plans of care for the initial episodes of care and the recertifications, which the court stated was the center of Ubani's activity.

Ubani contends that because she did not exercise supervisory discretion in her role, her position as a registered nurse is insufficient for the enhancement to apply. We have found, though, that the evidence did show Ubani was, in fact, acting as a supervisor over other employees.

In addition, Cynthia Garza-Williams testified that she would take blank OASIS forms to patients for their signatures. She explained that she would bring the forms back to the office where Ubani would fill in information without having seen the patients and then certify the assessments as an RN. Plans of care were taken to Dr. Echols, who was paid for his certifications. Garza-Williams testified that Dr. Echols would sign whatever was given to him. The testimony from the claims analyst and agent Harshaw show that Medicare relied on the representations made by physicians and RNs, and under this described

No. 12-20095

scheme, Ubani essentially made the determination that specific patients qualified for home health care. Accordingly, the enhancement under Section 3B1.3 was proper. *Miller*, 607 F.3d at 149.

### 3. Caroline Njoku

The district court's oral pronouncement of Njoku's sentence on Count 2 was 60 months' imprisonment. The written judgment provides for a sentence of 63 months. When "there is any variation between the oral and written pronouncements of sentence, the oral sentence prevails." *United States v. Martinez*, 250 F.3d 941, 942 (5th Cir. 2001). We will remand so that the district court may amend its written judgment to conform to its oral sentence.

We REMAND for the district court to amend Njoku's written judgment to conform to her oral sentence. In all other respects, we AFFIRM the district court's judgment.